**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MICHAEL ACKERMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO.; AIRLINE TARIFF PUBLISHING COMPANY; 3VICTORS, INC.; AMERICAN AIRLINES GROUP INC.; DELTA AIR LINES, INC.; UNITED AIRLINES, INC.; ALASKA AIR GROUP, INC.; HAWAIIAN HOLDINGS, INC.; and JETBLUE AIRWAYS CORPORATION,<br><br>Defendants. | Civil Action No. ___________________<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Michael Ackerman ("Plaintiff"), individually and on behalf of all others similarly situated, makes this Complaint against Defendants Southwest Airlines Co. ("Southwest"); Airline Tariff Publishing Company ("ATPCO"); 3Victors, Inc. ("3Victors"); American Airlines Group Inc. ("American"); Delta Air Lines, Inc. ("Delta"); United Airlines, Inc. ("United"); Alaska Air Group, Inc. ("Alaska Air Group") and Hawaiian Holdings, Inc. ("Hawaiian") (together, "Alaska"); and JetBlue Airways Corporation ("JetBlue"). Southwest, American, Delta, United, Alaska, and JetBlue are the "Airline Defendants," and all defendants together are "Defendants." Plaintiff asserts Counts I and III on behalf of the American Purchaser Class and Counts II and IV on behalf of the JetBlue Purchaser Class; each Count identifies the defendants against which it is asserted. Plaintiff, upon personal knowledge as to the facts pertaining to himself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to Section 1 of the Sherman Act, and demands a trial by jury on all matters so triable.

## NATURE OF THE ACTION

1. This case challenges an information exchange among competing airlines. ATPCO, a fare-data company that airlines own and govern, and its subsidiary 3Victors collect each participating airline's nonpublic shopping data—records of the prices the airline's systems offer to travelers who search for flights—and return competitors' data to each airline that contributes its own. Plaintiff alleges that the exchange gives rival airlines a current, carrier-by-carrier view of one another's prices, that this view discourages price cuts, and that purchasers of domestic air travel have paid higher fares as a result.

2. Airlines have a strong incentive to discount. Once a flight is scheduled, an empty seat earns nothing, and carrying one more passenger adds little cost. An airline with unsold seats

therefore gains from selling them at any fare above that small added cost, and rival airlines can undercut one another toward it.[1] Price competition of that kind benefits travelers.

3. ATPCO and its airline owners have faced antitrust scrutiny before over what airlines could learn through ATPCO. In 1992, the U.S. Department of Justice ("DOJ") sued ATPCO and eight airlines, alleging that the airlines used fare filings in ATPCO's system to propose, negotiate, and coordinate fare increases. The case ended in consent decrees that, among other things, limited what airlines could learn about one another's fares through ATPCO to fares actually available to the public. The decrees did not adjudicate DOJ's allegations, and they have expired.[2]

4. Beginning in the early 2010s, the airline industry began moving toward "dynamic pricing," in which an airline computes a price when a traveler searches instead of choosing from fares filed in advance with ATPCO. A price computed for one traveler need not appear in the filed-fare data that competing airlines had long read. Dynamic pricing therefore threatened to weaken each airline's ability to see and answer its rivals' price cuts.[3]

---

[1] Tom Gregorson, *Dynamic Pricing*, ATPCO (Elevate 2017, Oct. 2017), slide 27, https://www.slideshare.net/slideshow/elevate-2017-pricing-evolution-the-road-to-dynamic-offer-generation-82074068/82074068 (last visited Nov. 18, 2026) [hereinafter *2017 ATPCO Presentation*]; Michael D. Wittman, *Dynamic Pricing Mechanisms for Airline Revenue Management: Theory, Heuristics, and Implications* (Feb. 20, 2018) (Ph.D. dissertation, Massachusetts Institute of Technology), at 183, https://dspace.mit.edu/entities/publication/1170e447-7842-4b61-8184-82152f7b45b3 (last visited Nov. 19, 2026) [hereinafter *Wittman Dissertation*].

[2] Complaint, *United States v. Airline Tariff Publ'g Co.*, No. 92-2854 (D.D.C. Dec. 21, 1992), https://www.justice.gov/atr/case-document/file/483631/dl (last visited Nov. 19, 2026) [hereinafter *1992 Complaint*]; Competitive Impact Statement, *United States v. Airline Tariff Publ'g Co.*, No. 92-2854 (D.D.C. Dec. 21, 1992), at 2, https://www.justice.gov/atr/case-document/file/627946/dl (last visited Nov. 18, 2026) [hereinafter *1992 CIS*]; Final Judgment, *United States v. Airline Tariff Publ'g Co.*, No. 92-2854 (D.D.C. Aug. 10, 1994), § IV, https://www.justice.gov/atr/case-document/file/483611/dl (last visited Nov. 18, 2026) [hereinafter *1994 Decree*].

[3] Order to Show Cause, *Action on IATA Agreement*, Order 2014-5-7, Docket No. OST-2013-0048 (U.S. Dep't of Transp. May 21, 2014), at 2, https://www.transportation.gov/sites/dot.gov/files/docs/IATA_Res_787_showcause.pdf (last visited Nov. 19, 2026) [hereinafter *DOT Order 2014-5-7*]; *2017 ATPCO Presentation* at slides 15–16; *id.* at slide 33.

5. ATPCO studied that threat. In 2016, it formed a Dynamic Pricing Working Group whose members included about twenty airlines.[4] At its October 2017 industry conference, ATPCO presented research it had commissioned. One slide showed two airlines that could not see each other's offers cutting a $350 fare a dollar at a time until one reached marginal cost. The slide stated that this undercutting "[c]ould [be] mitigated by the availability of improved pricing data," and the presentation reported concern that next-generation pricing "could reduce the ability of airlines to evaluate and respond to competitor price changes."[5]

6. In 2018, Michael D. Wittman, a co-author of the ATPCO-commissioned study, wrote in his doctoral dissertation that "the facet of dynamic pricing that poses the greatest risk to the status quo of airline competition is the reduced ability of airlines to monitor the pricing actions of their competitors." He proposed "a market for information" as a remedy: "By giving airlines additional information about the pricing actions of their competitors, airlines could maintain pricing discipline without costly price wars."[6]

7. ATPCO then built the means to collect airlines' dynamic prices in common terms. Working with airlines, it wrote a standard under which a participating airline's dynamic price is recorded as one of the airline's filed fares at a different amount and reported to ATPCO, while staying out of the fare data distributed to competitors.[7] Under that standard, ATPCO kept offers

---

[4] Melanie Dezelak & Richard Ratliff, *Towards New Industry-Standard Specifications for Air Dynamic Pricing Engines*, 17 J. Revenue & Pricing Mgmt. 394 (2018), https://link.springer.com/article/10.1057/s41272-018-0148-y (last visited Nov. 18, 2026).

[5] *2017 ATPCO Presentation* at slide 27; *id.* at slide 33.

[6] *Wittman Dissertation* at 217–18.

[7] ATPCO, *Adjusted Pricing via Dynamic Pricing Engine (DPE) Implementation Guide* (draft Feb. 2020), at 12, 19–20, 26, https://web.archive.org/web/20220121231620id_/https://www.atpco.net/sites/atpco-public/files/2019-09/dynamic-pricing-dpe_impguide.pdf (last visited Nov. 18, 2026) [hereinafter *DPE Guide*]; ATPCO, *ATPCO Updates* (presentation at IATA 5th World Financial Symposium and 7th SIS General Meeting, Sept. 18, 2018), at 25, https://www.iata.org/contentassets/9b1d8d19a6244e4e8cb8c7d7ad3f45e5/atpco_updates.pdf (last visited Nov. 18, 2026) [hereinafter *2018 IATA Presentation*].

that no traveler bought "for historical/analytical purposes," even though its own guide said that waiting for a ticket sale "is sufficient to support revenue accounting and settlement requirements."[8] In 2022, ATPCO's chief executive wrote that ATPCO's board had approved the goal of building a framework for dynamically created offers and that ATPCO would build it "leveraging the data airlines trust us with."[9]

8. In July 2023, ATPCO announced that its eleven board airlines had approved a first step toward pooling airlines' shopping data: access to Amazon Web Services ("AWS") Clean Rooms "to collaborate and analyze their collective datasets." ATPCO reported that "multiple airlines" were "already providing their shopping data, including dynamically generated pricing."[10] In December 2023, ATPCO acquired 3Victors, describing the purchase as following its announcement that it would use AWS Clean Rooms "to enable ATPCO and participating airlines to analyze their collective shopping insights."[11]

9. By 2025, 3Victors operated two connected products. Iris is a repository that pools shopping data, including dynamic prices, drawn directly from participating airlines' systems. PriceEye is a pricing-intelligence product, built on Iris data, that shows an airline its rivals' prices and flags where a rival has undercut it.[12] Access works on give-to-get terms: "Participation in Iris

---

[8] *DPE Guide* § 6.3.2, at 38.

[9] Alex Zoghlin, *Changing the Game for Dynamic Offers, One Innovation at a Time*, ATPCO (July 29, 2022), https://web.archive.org/web/20251111101842/https://atpco.net/single-blog/changing-the-game-for-dynamic-offers-one-innovation-at-a-time/.

[10] Press Release, ATPCO, ATPCO Leverages AWS Clean Rooms to Enable Airline Dynamic Offers Functionality at Scale (July 21, 2023), https://atpco.net/single-press/atpco-leverages-aws-clean-rooms-to-enable-airline-dynamic-offers-functionality-at-scale/ (last visited Nov. 18, 2026) [hereinafter *Clean Rooms Release*].

[11] Press Release, ATPCO, Airline Data Powerhouse ATPCO Buys Data Intelligence Platform 3Victors (Dec. 5, 2023), https://atpco.net/single-press/airline-data-powerhouse-atpco-buys-data-intelligence-platform-3victors/ (last visited Nov. 18, 2026) [hereinafter *3Victors Acquisition Release*].

[12] *Seeing the Market Clearly with PriceEye*, ATPCO Elevate 2026, https://elevate.atpco.net/sessions/seeing-the-market-clearly-with-priceeye (last visited [DATE]) [hereinafter *PriceEye Session Page*];

is based on a simple principle: the more you contribute, the more you receive.”[13] 3Victors tells airlines that Iris gives them the insight to “confidently monitor the competitive landscape and adjust pricing strategies as markets shift—hour by hour, not day by day.”[14]

10. Every part of the exchange was in place by 2026. That year, the Airline Defendants raised fares, accepted fewer passengers rather than cut fares, did not lower fares when fuel prices fell, and told investors they expect to keep the increases.[15]

11. Through Iris and PriceEye, competing airlines now see one another’s individualized prices that dynamic pricing would otherwise have kept from them, and the information they obtain is broader than what the public sees. Plaintiff brings four claims under Section 1 of the Sherman Act on behalf of two classes of direct purchasers. Counts I and II challenge the agreement to set up and maintain the exchange. Counts III and IV challenge the agreement among airlines to use the exchange to share their data.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; each Class has more than 100 members; and at least one member of each Class is a citizen of a State different from at least one Defendant.

---

*PriceEye*, 3Victors, https://www.3victors.com/priceeye (“How PriceEye works” section, “Insights” tab) (last visited Nov. 19, 2026) [hereinafter *3Victors PriceEye Page*].

[13] *Data*, 3Victors, https://www.3victors.com/data (“How contribution works”) (last visited Nov. 18, 2026) [hereinafter *3Victors Data Page*].

[14] *Id.* (“Why contribute?” tab).

[15] *See infra* Part XVI.D.

13. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because one or more of Defendants transacts business, is found, or has agents in this District; a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce was carried out in this District.

14. Two Airline Defendants are headquartered in this District. Southwest is a Texas corporation with its principal executive offices in Dallas, Texas, within the Dallas Division.[16] American Airlines Group Inc. and its airline subsidiary, American Airlines, Inc., maintain their principal executive offices in Fort Worth, Texas.[17] And 3Victors, Inc.'s headquarters or principal place of business is in Plano, Texas.

15. ATPCO promoted the exchange in this District. On November 1, 2023, at the Skift Aviation Forum held at the Omni Fort Worth hotel in downtown Fort Worth and hosted with DFW, ATPCO's then-chief executive described ATPCO's give-to-get shopping-data program to an airline-industry audience in a session presented with AWS, as alleged below.[18]

---

[16] Southwest Airlines Co., Annual Report (Form 10-K) for the Fiscal Year Ended Dec. 31, 2025, cover page, https://www.southwestairlinesinvestorrelations.com/sec-filings/all-sec-filings/content/0000092380-26-000004/0000092380-26-000004.pdf (last visited Nov. 18, 2026) [hereinafter *Southwest 2025 Form 10-K*].

[17] American Airlines Grp. Inc. & American Airlines, Inc., Annual Report (Form 10-K) (Feb. 18, 2026), cover page, https://www.sec.gov/Archives/edgar/data/4515/0000006201-26-000014-index.html (last visited Nov. 18, 2026) [hereinafter *American 2025 Form 10-K*].

[18] *Charting New Territory with Skift Aviation Forum 2023*, Skift (June 5, 2023), https://skift.com/2023/06/05/charting-new-territory-with-skift-aviation-forum-2023 (last visited Nov. 18, 2026) [hereinafter *Charting New Territory*]; *Skift Aviation Forum Video: Why Leading Airlines Are Focused on Data*, Skift (Nov. 7, 2023), https://skift.com/2023/11/07/skift-aviation-forum-video-why-leading-airlines-are-focused-on-data/ (last visited Nov. 18, 2026); Skift, *Why Leading Airlines Are Focused on Data*, YouTube (Nov. 7, 2023) [hereinafter *Skift Forum Video Article*] (panel with Massimo Morin, Global Head of Travel, Amazon Web Services, and Alex Zoghlin, then-President and CEO of ATPCO, at Skift Aviation Forum, Fort Worth, Tex., Nov. 1, 2023), https://www.youtube.com/watch?v=eE42kcj4AEU (last visited Nov. 19, 2026) [hereinafter *Skift Session*].

16. Each Defendant is subject to personal jurisdiction in Texas under Federal Rule of Civil Procedure 4(k)(1)(A). Southwest is incorporated and headquartered in Texas, and American Airlines Group Inc. is headquartered in Texas. Each other Defendant purposefully directed the conduct alleged in this Complaint at Texas, including by selling or facilitating the sale of air travel to and from Texas airports, by participating in an exchange with airlines headquartered in Texas, and, as to ATPCO, by promoting the exchange in this District. Plaintiff's claims arise out of and relate to those contacts.

17. This Court also has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, which provides for nationwide service of process. Each Defendant (a) transacted business throughout the United States, including in this District; (b) sold, or facilitated the sale of, air passenger transportation throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an unlawful conspiracy directed at, and intended to injure, persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

### I. Plaintiff

18. Plaintiff Michael Ackerman resides in Pasadena, California. During the applicable Class Periods, he purchased one or more tickets for domestic air passenger transportation from American and JetBlue and paid more for those tickets than he would have paid absent the conduct alleged in this Complaint. He intends to purchase domestic air travel from American, JetBlue, and other Defendants in the future.

## II. Defendants

### A. Airline Defendants

19. Defendant Southwest Airlines Co. is a Texas corporation with its principal executive offices in Dallas, Texas.[19] Southwest operates flights and sells tickets to the public under its own name. On information and belief, Southwest subscribed to and used PriceEye and contributed shopping data to Iris during the Class Periods.

20. Defendant American Airlines Group Inc. is a Delaware corporation with its principal executive offices in Fort Worth, Texas.[20] American Airlines Group Inc. conducts its airline business through its wholly owned subsidiary American Airlines, Inc., which operates flights and sells tickets to the public. American is a co-owner of ATPCO.[21] American's vice president of revenue management sat on ATPCO's board in 2023.[22] On information and belief, American has subscribed to PriceEye and contributed shopping data to Iris.

21. Defendant Delta Air Lines, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia. Delta operates flights and sells tickets to the public under its own name. Delta is a co-owner of ATPCO.[23] On information and belief, Delta participated in the information exchange alleged in this Complaint through PriceEye, Iris, ATPCO's data clean rooms, or its ownership and governance of ATPCO.

---

[19] *Southwest 2025 Form 10-K*;

[20] *American 2025 Form 10-K*.

[21] *Def. Airline Tariff Publishing Co.'s Disclosure of Non-Party Interested Entities or Persons* at 1, *Prosterman v. Airline Tariff Publishing Co.*, No. 3:16-cv-02017-MMC (N.D. Cal. Apr. 29, 2016), ECF No. 28 [hereinafter *APTCO's 2016 Cert. of Interested Parties*].

[22] Press Release, ATPCO, ATPCO Announces New Chairperson of the Board (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 18, 2026) [hereinafter *April 2023 Board Release*];

[23] *APTCO's 2016 Cert. of Interested Parties* at 1.

22. Defendant United Airlines, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. United operates flights and sells tickets to the public and is a subsidiary of United Airlines Holdings, Inc., which is not named as a defendant.[24] United is a co-owner of ATPCO.[25] On information and belief, United participated in the information exchange alleged in this Complaint through PriceEye, Iris, ATPCO's data clean rooms, or its ownership and governance of ATPCO.

23. Defendant Alaska Air Group, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Alaska Air Group conducts its airline business through operating subsidiaries, including Alaska Airlines, Inc.

24. Defendant Hawaiian Holdings, Inc. is a Delaware corporation with its principal place of business in Honolulu, Hawaii. Alaska Air Group acquired Hawaiian on September 18, 2024.[26] On information and belief, Hawaiian conducts its airline business through its operating subsidiary, Hawaiian Airlines, Inc. Hawaiian's chief revenue officer served on ATPCO's board from 2014 until at least 2024.[27] On information and belief, Hawaiian participated in the information exchange alleged in this Complaint through PriceEye, Iris, ATPCO's data clean rooms, or its participation in ATPCO's governance.

25. Defendant JetBlue Airways Corporation is a Delaware corporation with its principal place of business in Long Island City, New York. JetBlue operates flights and sells tickets

---

[24] United Airlines Holdings, Inc. & United Airlines, Inc., Annual Report (Form 10-K) (Feb. 12, 2026), https://www.sec.gov/Archives/edgar/data/100517/000010051726000023/ual-20251231.htm (last visited Nov. 18, 2026) [hereinafter *United 2025 Form 10-K*].

[25] *APTCO's 2016 Cert. of Interested Parties* at 1.

[26] News Hub, *Alaska Airlines completes acquisition of Hawaiian Airlines, expanding benefits and choice for travelers*, ALASKA AIRLINES (Sept. 18, 2024), https://news.alaskaair.com/company/alaska-airlines-completes-acquisition-of-hawaiian-airlines-expanding-benefits-and-choice-for-travelers/.

[27] *April 2023 Board Release*.

to the public under its own name. On information and belief, JetBlue has subscribed to PriceEye and contributed shopping data to Iris.

**B. ATPCO and 3Victors**

26. Defendant Airline Tariff Publishing Company is a District of Columbia corporation with its principal place of business in Herndon, Virginia. ATPCO describes itself as owned by airlines.[28] On information and belief, its owners include Delta, American, and United. Representatives of eleven airlines sit on ATPCO's board.[29] Airlines file their fares through ATPCO, and ATPCO standardizes that fare data and redistributes it across the travel industry. ATPCO also sells pricing tools of its own, including a fare-management product called Architect.[30]

27. Defendant 3Victors, Inc. is a Delaware corporation. ATPCO acquired 3Victors in or about December 2023.[31] 3Victors describes itself as "an ATPCO company"[32] and its principal place of business is in Plano, Texas. 3Victors operates the Iris shopping-data repository and the PriceEye product described in this Complaint.

---

[28] *About ATPCO*, ATPCO, https://atpco.net/about/ (last visited Nov. 18, 2026) (earlier version captured June 14, 2020, at https://web.archive.org/web/20200614202230/https:/www.atpco.net/about) [hereinafter *About ATPCO*]; Press Release, ATPCO, Airline Data Platform ATPCO Acquires Rich Content Provider Routehappy (Feb. 1, 2018), https://www.globenewswire.com/news-release/2018/02/01/1329917/0/en/Airline-Data-Platform-ATPCO-Acquires-Rich-Content-Provider-Routehappy.html (last visited Nov. 18, 2026) [hereinafter *Routehappy Release*].

[29] *Clean Rooms Release*.

[30] Press Release, ATPCO, ATPCO Unveils Architect (Nov. 23, 2020), https://atpco.net/press/atpco-unveils-architect-a-powerful-new-pricing-tool-with-icelandair-and-latam-airlines-as-launch-customers/ (last visited Nov. 18, 2026) [hereinafter *Architect Release*].

[31] *3Victors Acquisition Release*.

[32] 3Victors, *The Competitive Intelligence Crisis: Why Dynamic Offers and AI Agents Demand a New Approach*, https://www.3victors.com/shopping-data (last visited Nov. 18, 2026) [hereinafter *3Victors White Paper*].

### C. Corporate Families, Agents, and Co-Conspirators

28. Each Defendant named in this Complaint is a separate legal entity. Where this Complaint refers to an airline by its brand or defined name, it refers to the named Defendant acting directly or through its operating subsidiaries, officers, employees, and agents, each of which acted within the scope of its authority.

29. Other persons, firms, and corporations not named as defendants, including other airlines that own, govern, or participate in ATPCO, PriceEye, Iris, or ATPCO's data clean rooms, participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance of them. Plaintiff reserves the right to name additional co-conspirators as defendants.

## FACTUAL ALLEGATIONS

### I. Airlines have long filed their fares through ATPCO, where rivals can read them.

30. ATPCO maintains a database of airline fares that travel agents and others across the travel industry use. For decades, airlines have used that database to advertise their fares. Each fare record contains a route (an origin and a destination), a price, and a set of fare "rules" that govern matters such as whether the ticket is refundable. For any scheduled flight, an airline may offer several fares at different prices with different rules.

31. Traditionally, airlines set ticket prices in two steps. First, an airline filed a set of fares with ATPCO. Each fare was tied to a booking class—a code that groups seats sold at the same fare level—and carried its own rules on advance purchase, refundability, and similar terms. Second, the airline's revenue-management software decided which booking classes would be offered for sale on each flight. A traveler was always presented with one of the filed fares. What varied over time was which filed fares remained available. Airlines offered the same set of fares to all or nearly all travelers and published those fares in ATPCO's database.

32. ATPCO illustrated this process in a presentation at its October 2017 industry conference, Elevate 2017. In the example they laid out, an airline filed four fares for a flight: $400 with no restrictions, $300 bought at least three days ahead, $200 bought at least seven days ahead, and $100 bought at least fourteen days ahead. The cheaper fares could not be refunded or changed. The airline's revenue-management system then limited how many seats could be sold at each fare.[33]




**Figure 1.** Tom Gregorson, *Dynamic Pricing*, ATPCO (Oct. 2017), https://www.slideshare.net/slideshow/elevate-2017-pricing-evolution-the-road-to-dynamic-offer-generation-82074068/82074068 (last visited Nov. 18, 2026) ("2017 ATPCO Presentation"), slide 13.

33. According to the presentation, this approach involved selecting from among "a pre-set menu of possible price points."[34] The price a traveler saw depended on which items on that menu remained open, not on a price specifically computed for that individual traveler.

---

[33] *2017 ATPCO Presentation* at slide 13.

[34] *Id.* at slide 19.

34. By sharing fare data through ATPCO, each airline could see its competitors' fares and thus avoid costly price competition to attract customers by setting prices in line with their competitors. In a regulatory suit filed alongside several state attorneys general, DOJ in 2013 alleged that "all airlines have complete, accurate, and real-time access to every detail of every airline's published fare structure" through ATPCO.[35] As ATPCO itself later admitted, airlines had "driven their pricing strategy and competitive responses by managing availability" within that structure.[36] That suit was not the first time the government had acted to restrain the airlines' and ATPCO's anticompetitive scheme.

## II. DOJ previously sued ATPCO and its airline owners over fare signaling through ATPCO.

35. On December 21, 1992, DOJ brought a suit against ATPCO and eight airlines in the United States District Court for the District of Columbia: Alaska Airlines, American Airlines, Continental Airlines, Delta Air Lines, Northwest Airlines, Trans World Airlines, United Air Lines, and USAir. *United States v. Airline Tariff Publishing Co.*, No. 92-2854 (D.D.C.) (the "1992 Action"). DOJ described the suit as the product of an "intensive three-year investigation of airline pricing practices."[37]

---

[35] Complaint, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236, ECF No. 1 (D.D.C. Aug. 13, 2013), ¶ 44, https://www.justice.gov/atr/case-document/file/514531/dl (last visited Nov. 18, 2026) [hereinafter *2013 Complaint*].

[36] ATPCO, *Dynamic Pricing: Definition, Impact, and Current Capabilities*, at 4, https://d3i59dyun0two3.cloudfront.net/wp-content/uploads/media/2025/01/14144915/dynamic-pricing-capabilities-whitepaper.pdf (last visited Nov. 18, 2026) [hereinafter *ATPCO Dynamic Pricing White Paper*].

[37] Press Release, *Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System, Dept. of Justice* (Dec. 21, 1992), https://www.justice.gov/archive/atr/public/press_releases/1992/211323.htm (last visited Nov. 18, 2026).

36. Per DOJ's allegations, ATPCO was "wholly owned by a group of airlines that includes the airline defendants" and described ATPCO as "a joint venture in which all of the airline defendants are co-owners."[38]

37. DOJ's first claim centered on proposed fares that appeared in ATPCO's data but could not yet be bought by passengers on the market. An airline could publish to ATPCO a fare with a "first ticket date" in the future. The fare entered ATPCO's database and was shown to competing airlines, but no traveler could buy a ticket at that fare until the first ticket date arrived. According to DOJ, the airlines used these filings and codes to communicate with one another and coordinate pricing. DOJ alleged that from April 1988 through at least May 1990, the airline defendants used ATPCO to exchange proposals for and negotiate fare increases, and to provide visibility and assurances about the details thereof.[39]

38. DOJ further detailed how the airlines used and examined the ATPCO data in a manner unavailable to the public. The airlines, said the DOJ, ran ATPCO data through "sophisticated computer programs to produce detailed daily reports" that let them "identify and track their competitors' proposed changes to fares."[40] Travel agents, who sold tickets through computer reservation systems and functioned as a key provider of fares to the public, had no comparable way to sort or analyze the same data.[41]

39. DOJ's second claim did not allege an actual agreement to raise fares. Rather, under the rule of reason, DOJ alleged that the airlines operated their database and information sharing scheme in a way that "unnecessarily facilitates coordinated interaction"—that is, in ways that

---

[38] *1992 Complaint* ¶ 3; *1992 CIS* at 2; 59 Fed. Reg. 15225 (Mar. 31, 1994).

[39] *1992 CIS* at 2; 59 Fed. Reg. 15,225 (Mar. 31, 1994), https://www.govinfo.gov/content/pkg/FR-1994-03-31/html/94-7672.htm (last visited Nov. 18, 2026) [hereinafter *1994 Federal Register Notice*].

[40] *1994 Federal Register Notice.*

[41] *Id.*; *1992 CIS* at 9.

distributing fares did not require. DOJ's claim was "based on the airline defendants' joint ownership and participation in [ATPCO]."[42]

40. The case ended in two consent decrees. United and USAir consented to a decree entered in 1993, and ATPCO and the remaining six airlines to one entered in 1994.[43] The decrees limited the airlines' information sharing through ATPCO to the fares actually on sale and available to the public.[44] The decrees prohibited the airlines from using the ATPCO database to give competitors advance notice of fares they planned to charge or provide other information about future pricing,[45] and it could not let competing airlines see the internal codes it used to manage its own fares.[46]

41. As noted, the 1994 Decree bound ATPCO. ATPCO could not distribute fares not yet for sale, could not share airlines' internal codes with others, could not give airlines information about changes to fares before providing that information to the public, and could not update fares faster than public systems were capable of doing.[47] That is, the 1994 Decree prohibited ATPCO from giving the airlines information about rivals' fares that the travel agents selling those fares did not also have.[48]

42. The decrees lasted ten years apiece. The airlines, however, did not abide by them for that entire period. On August 6, 2004, days before the 1994 Decree expired, DOJ petitioned

---

[42] *1994 Federal Register Notice*.

[43] *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9 (D.D.C. 1993); Final Judgment, *United States v. Airline Tariff Publ'g Co.*, No. 92-2854 (D.D.C. Nov. 1, 1993), https://www.justice.gov/atr/final-judgment-us-v-airline-tariff-publishing-company-et-al (last visited Nov. 18, 2026) [hereinafter *1993 Decree*]; *1994 Decree*.

[44] *See 1993 Decree* § IV(D); *1994 Decree* § IV(A)(4).

[45] *1993 Decree* § IV(B); *1994 Decree* § IV(A)(2).

[46] *1993 Decree* § IV(C); *1994 Decree* § IV(A)(3).

[47] *1994 Decree* § IV(B).

[48] *See id.*

the court to hold American Airlines in civil contempt.[49] DOJ alleged that American had sent fares to the database with future travel dates that had "little or no relevance for consumers," and alleged that ATPCO was "a company jointly owned by American and a number of other airlines" through which "[m]ost domestic airline fares are disseminated."[50] The matter was resolved by a settlement agreement and order, which prohibited American from "using travel dates to initiate or match a fare increase," imposed a $3,000,000 civil penalty, and ran for seven years.[51] On information and belief, the last of these orders expired in 2011.

**III. Dynamic pricing threatened to take airline prices out of the shared fare data.**

43. In the 2010s, airlines began the process of individualizing ticket fares. As noted, under the pre-existing system, travel agents and travelers received fares that had been filed with ATPCO. Then, in 2012, the industry started to transition to a different, customized ticket sales model: the International Air Transport Association ("IATA"), the industry's global trade association, adopted Resolution 787, which proposed the so-called New Distribution Capability ("NDC"). NDC enables an airline to answer a shopper's specific request directly with an offer assembled uniquely for that request, rather than providing a fare from the pre-set list used in the incumbent model. The resolution called for the airlines to acquire the "capability to provide personalized pricing offers to consumers who shop for air transportation."[52] According to

---

[49] Petition of the United States for an Order to Show Cause Why Respondent American Airlines, Inc. Should Not Be Found in Civil Contempt, *United States v. Am. Airlines, Inc.*, No. 92-2854 (D.D.C. Aug. 6, 2004), https://www.justice.gov/atr/case-document/file/483586/dl (last visited Nov. 18, 2026) [hereinafter *2004 Contempt Petition*].

[50] *Id.* ¶¶ 4, 9.

[51] Settlement Agreement and Order, *United States v. Am. Airlines, Inc.*, No. 92-2854 (D.D.C. Sept. 23, 2004), §§ IV, VII, https://www.justice.gov/atr/case-document/file/483566/dl?inline= (last visited Nov. 18, 2026) [hereinafter *2004 Settlement Order*].

[52] *DOT Order 2014-5-7* at 2.

statements the IATA made to the U.S. Department of Transportation ("DOT"), NDC would allow carriers to "customize service and amenity packages and prices based on consumer attributes."[53]

44. Due to the immediacy and individualization of this approach, NDC made possible fare offers that bypassed ATPCO's databases. NDC would allow airlines to produce a price for each customer query and market that price directly to the traveler or travel agent—the list of fares filed with ATPCO would never need to be consulted. DOT held a proceeding on the proposed resolution, where airlines that supported 787 said it would allow "airlines to directly present offers to the consumer."[54] Conversely, opponents of the resolution expressed their fear that if 787 were adopted and NDC went live, airlines "would no longer have to file publicly available fares."[55]

45. The transition to the new approach was well underway in 2014, when Airlines for America ("A4A"), the trade association of the major U.S. airlines, stated in comments to DOT that "new technologies enable the airlines to price their products and services in a dynamic way" and that "the strong trend in pricing ancillary services is customized pricing."[56]

46. ATPCO was monitoring these shifts and by 2015 had begun to plan its response. ATPCO published a white paper on dynamic pricing that opened with the risk the new model posed to its business: "There is a perception today that NDC will replace filed fares,"[57] given that

---

[53] *Id.*

[54] *Id.* at 3.

[55] *Id.* at 4.

[56] David A. Berg, Airlines for America, Response to Notice of Proposed Rulemaking Titled Transparency of Airline Ancillary Fees and Other Consumer Protection Issues, Docket No. DOT-OST-2014-0056 (Sept. 29, 2014), at 4, 25, https://airlines.org/wp-content/uploads/2014/09/A4A-Full-GDS-Comments.pdf (last visited Nov. 18, 2026) [hereinafter *A4A Comments*].

[57] *ATPCO Dynamic Pricing White Paper* at 2.

airlines were "contemplating and implementing even further personalization of pricing and product based on customer value."[58]

47. Around that time, Thomas Gregorson, who led product strategy at ATPCO, said in an interview that the airlines wanted ATPCO to provide the "infrastructure and central conduit for all distribution (NDC and traditional)." He acknowledged that ATPCO's existing capabilities "may not be enough for the future." The interview reported that "[a] multidisciplinary industry working group has been set up that will look at the next level of dynamic pricing capabilities."[59]

48. That ATPCO group was the Dynamic Pricing Working Group (the "Working Group"), formed in early 2016. The group was "to address airline requirements for creating customized offers," to help assess the consequences of transitioning from the traditional model to one built upon dynamic pricing, and it consisted of roughly twenty airlines; three global distribution systems ("GDSs"), which are the reservation networks used by travel agents; and "several marketing and technology providers."[60]

49. The classical filed fares approach results in a shared price list accessible to every airline in ATPCO's database. With dynamic pricing, conversely, given that it generates bespoke fare offers for each customer, there is no central fare list, and each offer is seen only by the traveler who asked. This has profound consequences for pricing. Under the older model, airlines can easily see when their competitors lower prices: ATPCO's data updates within hours of the change, allowing competitors to decide whether to match a shift. Under dynamic pricing, a lowered offer made to one traveler does not appear in the shared data, meaning competitors may never learn of

---

[58] *Id.* at 5.

[59] *Executive Interview: Thomas Gregorson*, Airline Information, http://www.airlineinformation.org/opinion/executive-profiles/878-executive-interview-thomas-gregorson-md-product-strategy-development-tpco.html (last visited Nov. 18, 2026) [hereinafter *Gregorson Interview*].

[60] Dezelak & Ratliff, *supra* note 4.

it.[61] ATPCO's 2017 presentation contrasted the two approaches. Under dynamic pricing, an airline would "[s]elect prices freely from among a continuous range of possible values," anywhere from, in the example given, \$199 to \$499.[62] Taking the model to its furthest extreme, "prices are computed individually for each transaction," with consecutive fare offers potentially differing by hundreds of dollars and in key terms.[63] The fare is created the moment a customer asks, and not a moment before, and so does not appear on any list available to a competitor beforehand.




**Figure 2.** ATPCO's framework contrasting assortment optimization (a finite set of price points), dynamic price adjustment, and continuous pricing ("[s]elect prices freely from among a continuous range of possible values"). *Source:* 2017 ATPCO Presentation, slides 15–16 (last visited Nov. 18, 2026).

50. ATPCO explicitly recognized the threat dynamic pricing posed to inter-airline fare visibility. The 2017 presentation compared airlines with industries that had already adopted dynamic pricing. A table in the presentation examined whether an industry had a "Publicly-Available Price Structure[.]"[64] A price structure is, in essence, the fare list airlines published through ATPCO—that is, the complete set of prices a seller will charge and the conditions attached

---

[61] *2017 ATPCO Presentation* at slides 13, 15–16, 19.

[62] *Id.* at slide 15.

[63] *Id.* at slide 16.

[64] *Id.* at slide 17.

to each. As noted, for decades, airlines shared these fares, with their booking class and rules, through ATPCO's database before any traveler bought a ticket. ATPCO's presentation indicated that the airline industry does have publicly available pricing, while other industries and entities, like online retail and Airbnb, do not.[65] A retailer using customized, dynamic pricing does not publish a publicly available list. A competitor researching a retailer's prices must specifically search for themselves, and they will likely receive a different price than other prospective customers.

Pricing Mechanisms in a Variety of Industries Were Reviewed

| | Industry | Pricing Mechanism | Publicly-Available Price Structure? |
|---|---|---|---|
| Travel-Related w/ Asst. Opt. | Airlines | Assortment optimization | Yes |
| | Hotels | Assortment optimization | No |
| | Passenger rail | Assortment optimization | Yes |
| | Rental cars | Assortment optimization | No |
| Industries with Advanced Pricing | Online Retail | Dynamic price adjustment | No |
| | Airbnb | Continuous pricing | No |
| | On-demand transport | Dynamic price adjustment & transactional continuous pricing | Yes/No |

**Figure 3.** ATPCO's comparison of pricing mechanisms across industries, including the column "Publicly-Available Price Structure?" *Source:* 2017 ATPCO Presentation, slide 17 (last visited Nov. 18, 2026).

[65] *2017 ATPCO Presentation* at slide 17.

## IV. ATPCO's commissioned research warned that unseen discounts could drive fares toward cost.

51. ATPCO commissioned a study on the impact dynamic pricing would have on the industry.[66] PODS Research LLC prepared the resulting research for ATPCO (the "PODS Study"). Its authors were Peter Belobaba, a principal research scientist at the Massachusetts Institute of Technology's International Center for Air Transportation; William Brunger; and Michael D. Wittman.[67] ATPCO presented the PODS Study at Elevate 2017 in October 2017, in a session led by Mr. Gregorson, then ATPCO's Vice President of Products & Solutions, at which Dr. Belobaba presented the findings. According to ATPCO, the study was meant "to review current and next-generation pricing practices in the airline industry" and, among other goals, "[a]ssess potential implications of next-generation pricing on revenues, competition, customers, and internal processes."[68]




**Figure 4.** ATPCO slide stating purposes of the PODS Research study. *Source:* 2017 ATPCO Presentation, slide 12 (last visited Nov. 18, 2026).

---

[66] Peter P. Belobaba, William Brunger & Michael D. Wittman, PODS Research LLC, *Advances in Airline Pricing, Revenue Management, and Distribution: Implications for the Airline Industry* (discussion paper, Oct. 2017), https://d3i59dyun0two3.cloudfront.net/wp-content/uploads/media/2025/01/14144903/pods-summary-paper.pdf (last visited Nov. 18, 2026) [hereinafter *PODS Study*].

[67] *Id.*

[68] *2017 ATPCO Presentation* at slide 12.

52. The research showed that due to its immediacy and continuous pricing scale, dynamic pricing would let an airline discount fares more often and to smaller groups of travelers than filed fares allowed. Filed fares made it so that the lowest price an airline could offer at any moment was the cheapest fare it had filed and left open. A dynamic pricing engine could undercut that fare for just a single request, offering a discount to a traveler the engine estimated would otherwise pay less or not buy.[69]




**Figure 5.** ATPCO slide describing "Mechanism 6: Dynamic Offer Generation," in which an airline selects and prices a set of offers for each booking request. *Source:* 2017 ATPCO Presentation, slide 24 (last visited Nov. 18, 2026).

53. ATPCO's simulations demonstrated the logic behind this discounting: in every scenario tested, the simulation showed an airline would earn more by offering dynamic discounts to individual travelers than by raising prices for customers willing to pay more. Discounting

[69] *See id.* at slide 24.

through dynamic pricing added as much as 3.7 percent to revenue, while raising prices added at most 1.3 percent, with the widest gap when demand was lowest.[70]




**Figure 6.** ATPCO slide reporting simulated revenue gains from "Dynamic Incrementing" (0.4%–1.3%) and "Dynamic Discounting" (2.1%–3.7%) across demand scenarios. *Source:* 2017 ATPCO Presentation, slide 26 (last visited Nov. 18, 2026).

54. This somewhat counterintuitive result is explained by empty seats. From an economics perspective, airlines operate "with high fixed costs and low marginal costs."[71] Once a flight is scheduled, most of its cost—i.e., the cost of flying an airplane from point A to point B—is paid whether the seats are full or empty. Adding one more passenger to the flight adds a negligible cost (slightly more fuel and the cost of processing the ticket). This is what economists refer to as a "marginal cost." Seats left empty the week before a flight is scheduled to depart generate no revenue for the airline and therefore represent completely uncaptured returns. If, say,

[70] *Id.* at slide 26.

[71] *Wittman Dissertation* at 183.

a $50 discount persuades a traveler to purchase a $150 ticket instead of foregoing a $200 one, the airline takes in $150 it would otherwise have lost, minus the negligible marginal cost of carrying that passenger. Each competitor with empty seats is incentivized to run the same approach in competition for the target customer. When competing airlines can dynamically answer each other's discount with one of their own, absent informational coordination, nothing stops the recursive discounting until the offer finally reaches marginal cost.

55. This was precisely the risk ATPCO homed in on. The 2017 presentation featured a slide entitled "Implications for Airline Competition" stating that "[t]here may be an incentive for each firm to undercut the other until one firm reaches its marginal cost." The slide imagined a price war between two airlines, "AL1" and "AL2," kicking off at $350 per ticket. AL1 began by cutting its fare by a dollar to $349; AL2 answered at $348; AL1 lowered to $347, and so on, with each airline sliding down the dynamic pricing continuum. The cuts answered the other airline's most recent offer, because a traveler choosing between otherwise similar flights buys the cheaper one. The discounting continued until AL1 reached $99, a dollar below AL2's $100, which was set as the marginal cost of the seat for purposes of the illustration.[72] Neither airline opened with $100 as its asking price; rather, it was driven there by its competitor's discounting, and fares plummeted by more than 70 percent from where they began.

[72] *2017 ATPCO Presentation* at slide 27.




**Figure 7.** ATPCO slide "Implications for Airline Competition," illustrating two airlines undercutting each other from $350 toward marginal cost and stating that this "[c]ould [be] mitigated by the availability of improved pricing data." *Source:* 2017 ATPCO Presentation, slide 27 (last visited Nov. 18, 2026).

56. The presentation identified the key to preventing the war from beginning in the first place—information: undercutting "[c]ould [be] mitigated by the availability of improved pricing data."[73] The presentation also reported the industry concern that dynamic pricing "could reduce the ability of airlines to evaluate and respond to competitor price changes."[74] The logic is straightforward. A price cut pays off only while it remains unanswered. If AL2 does not learn of AL1's cut for days, AL1 captures days' worth of bookings at the lower fare. If AL2 picks up on the cut more quickly and matches it, AL1 gains almost nothing and risks a broader price war. The better each airline can see the other's prices, the faster it can respond to a discount, eliminating the incentive to begin the cycle in the first place.

---

[73] *Id.*

[74] *Id.* at slide 33.

57. Filed fares had given airlines that insight into each other's pricing. According to Wittman, one of the PODS authors, "Publicly filed fare[s] allow airlines to perfectly monitor when their competitors make pricing changes and react accordingly, including the possibility of responding with fare wars or punishments when undercutting is detected."[75] Indeed, in its suit against the major industry players, DOJ alleged that before 1992 the airlines had turned ATPCO's data into "detailed daily reports" of competitors' proposed fare changes, and in 2013 DOJ alleged that every airline still had "complete, accurate, and real-time access" to every competitor's published fares through ATPCO.[76] Dynamic pricing would upend this information exchange: a discount offered to one traveler at a time leaves no record in the database.

## V. ATPCO-affiliated research identified competitor monitoring as the remedy for dynamic price cuts.

58. The PODS authors continued to work on the dynamic pricing information exchange problem. Mr. Wittman's 2018 doctoral dissertation at MIT was titled "Dynamic Pricing Mechanisms for Airline Revenue Management: Theory, Heuristics, and Implications" (the "Wittman Dissertation"). He thanked "the members of the MIT PODS Consortium," an industry-funded group whose 2020 members included ATPCO, Alaska, Delta, and United, "for their financial support and for their many helpful suggestions and comments as this work evolved."[77] Dr. Belobaba, the primary author of the PODS study, supervised Wittman's dissertation,[78] and Mr. Wittman wrote that the PODS study's third author, William Brunger, had "inspired Chapter 6 of

[75] *Wittman Dissertation* at 184.

[76] *1994 Federal Register Notice*; *2013 Complaint* ¶ 44.

[77] *Wittman Dissertation* at 5; *Current Projects*, MIT Int'l Ctr. for Air Transp., https://icat.mit.edu/?p=46 (last visited Nov. 18, 2026) ("The PODS Consortium at MIT is funded by 14 industry members that in 2020 include Air Canada, Alaska, Amadeus, ATPCO, Boeing, Delta, Etihad, IAG, LATAM, Lufthansa Group, PROS, Qatar, Sabre and United.").

[78] *Wittman Dissertation* at 3.

this dissertation."[79] That chapter, titled "Implications of Dynamic Pricing for the Airline Industry," begins by asking, "Will dynamic pricing cause a race to the bottom?"[80] Moreover, the dissertation's abstract describes its focus as addressing "airline concerns that dynamic pricing could lead to price wars, excessive discounting, and a race to the bottom."[81]

59. The dissertation concludes by identifying the same danger to the industry the PODS study did, namely, dynamic pricing's elimination of price visibility among competitors: "[T]he facet of dynamic pricing that poses the greatest risk to the status quo of airline competition is the reduced ability of airlines to monitor the pricing actions of their competitors. Unlike traditional pricing and RM [revenue management], in which filed fare structures can easily be observed by all airlines, dynamic price adjustments may be targeted to specific customers, making it more difficult for airlines to know when their competitors are discounting. This could lead to the possibility of price wars, as airlines react to real or perceived pricing actions by their competitors."[82]

60. The dissertation detailed how airlines' view of one another's filed fares had prevented price wars, using the economic concept of a "cooperative equilibrium" to explain.[83] Cooperative equilibriums emerge when competitors maintain prices above the competitive level without express coordination or agreement, because each anticipates that undercutting the inflated price would be seen by fellow participants in the equilibrium and punished by them. "Defecting"

---

[79] *Id.* at 5 & title page.

[80] *Id.* at 181.

[81] *Id.* at 3.

[82] *Id.* at 217–18.

[83] *Id.* at 40–41, 191–93.

from the equilibrium means undercutting the price and imperiling the group's higher earnings.[84] Airlines have persistent rivals in the industry that they compete with on a repeated, yearslong basis, so each competitor can reasonably expect a cut to be answered. According to the dissertation, it is that repeated competition, together with filed fares, that holds airlines in the equilibrium: "Most importantly, repeated multimarket interactions and the public nature of filed fare structures serve as monitoring and punishment mechanisms for airlines that defect from the cooperative equilibrium."[85]

61. The dissertation went on to say that when competitors do not have visibility into each other's prices, it is more difficult for participants in the equilibrium to punish one another's undercutting, making it more appealing to attempt. "If the firm cannot observe when its competitors are cheating," the dissertation stated, "it may be more difficult to apply punitive actions, weakening cooperative equilibria."[86] Purely private, non-advance information about competitors' pricing actions, such as exists with dynamic pricing, means "cooperation becomes even more difficult," and "[t]he difficulty of punishment in this setting increases the incentives to defect."[87] The dissertation cited Edward Green and Robert Porter's article "Noncooperative Collusion under Imperfect Price Information" to back up this proposition.[88] In the dynamic that article explores, firms cannot directly observe each other's decisions or conduct, so a firm whose sales suddenly fall is unable to discern whether a competitor's "cheating" or an unexpected drop

[84] *Id.* at 191–92; Edward J. Green & Robert H. Porter, *Noncooperative Collusion Under Imperfect Price Information*, 52 Econometrica 87 (1984).

[85] *Wittman Dissertation* at 202.

[86] *Id.* at 197.

[87] *Id.* at 198.

[88] *Id.* at 197–98 & bibliography.

in demand—what economists call a "demand shock"—is the cause.[89] In sum, the freer the information exchange, the easier economic signals are to read, the fewer the prices wars. Or, in the words of the dissertation, "price wars will happen less often and for shorter periods when the chance of the demand shock is low, because it will be more obvious when firms are deviating from the cooperative equilibrium."[90]

62. According to the dissertation, dynamic pricing creates exactly that situation in which airlines can no longer see one another's prices. The dissertation called research on "secret price cuts" a "good representation of the dynamic pricing scenario with privately filed fares," in which "airlines would be unable to see each others' prices, and could choose to charge prices lower than the filed fares for some customers."[91] The dissertation called "a move away from publicly filed fares" "the facet of dynamic pricing that has the potential to lead to the greatest changes to airline competition in regards to the race to the bottom."[92] Its chapter summary reiterated this point: "The feature of dynamic pricing that could most likely lead to a race to the bottom is if dynamic pricing requires airlines to partially move away from publicly-filed fares. In this case, it may be more difficult for airlines to observe the pricing actions of their competitors, and could allow airlines to practice secret price cuts."[93]

63. The dissertation reported worries within the industry itself, stating that "airlines have expressed concerns that dynamic pricing specifically will spur a race to the bottom," and that "[t]he lack of public monitoring of dynamic pricing actions has often been cited by airlines as a

---

[89] *Id.* at 197–98; Green & Porter.
[90] *Wittman Dissertation* at 198.
[91] *Id.* at 199.
[92] *Id.* at 196.
[93] *Id.* at 202.

key concern in reference to the race to the bottom."[94] Reflecting on this, the dissertation argued "airlines may need to reconsider how they monitor and respond to the pricing actions of their competitors."[95]

64. The dissertation's answer was more information, funneled through and delivered by a market built to disseminate it. The risks of dynamic pricing, it said, "could be mitigated through the creation of a market for information for dynamic price adjustment decisions. By giving airlines additional information about the pricing actions of their competitors, airlines could maintain pricing discipline without costly price wars."[96] It acknowledged the legal constraint and the workaround: "Direct communication between firms regarding pricing is generally illegal for reasons of antitrust. Yet this does not mean that monitoring is impossible. Technology companies currently exist that monitor the lowest available fares of airlines and sell that information to competitors. It is very likely that similar technology would emerge to monitor dynamic pricing behavior."[97] Even monitoring conducted on a slight delay, rather than instantaneously, could suffice: "if this monitoring is not conducted in real-time, it may still serve as a deterrent to short-term undercutting."[98] Looking forward, the dissertation observed that "new monitoring technologies . . . would help prevent the race to the bottom as a result of dynamic pricing in the long run."[99]

---

[94] *Id.* at 194, 196; *see also id.* at 3, 181, 209.

[95] *Wittman Dissertation* at 201.

[96] *Id.* at 218.

[97] *Id.* at 200.

[98] *Id.*

[99] *Id.* at 218.

## VI. ATPCO's airline owners direct its work through a board of pricing and revenue executives.

65. ATPCO is not a passive service provider; rather, it is owned by airlines and governed by a board of airline representatives.[100] Each airline owner appoints one of its employees—virtually always a pricing or revenue-management executive—to represent it on ATPCO's board.[101] In 2023, that board counted among its members United's vice president of pricing and revenue management, American's vice president of revenue management, and Hawaiian's chief revenue officer, as well as a similar official from Delta. Eight of the eleven board members in 2023 held pricing, revenue-management, or chief-revenue positions at their airlines.[102]

66. Indeed, on information and belief, each ATPCO board seat in effect belongs to a particular airline owner of ATPCO rather than to the individual who holds it. One ATPCO announcement described a director as having served as the "KLM Airlines board member for ATPCO."[103] When a director leaves a pricing or revenue-management role at the airline that employs the director, the director leaves ATPCO's board, and a successor from the same airline fills the seat.[104]

67. What's more, ATPCO's board members possess oversight of and approve ATPCO's product roadmap, decide the nuts and bolts of its information-exchange activities, and set the parameters for how the exchange functions and participating airlines interact with it,

---

[100] *About ATPCO*; *see also 1992 Complaint* ¶¶ 4–12, 20 (alleging that each airline defendant in the 1992 Action was an owner of ATPCO).

[101] *See, e.g.*, *April 2023 Board Release*.

[102] *Id.*

[103] *Id.*

[104] *See, e.g.*, Press Release, ATPCO, ATPCO Appoints LATAM Airlines Group Executive Rosario Phillips as New Chair of the Board (June 16, 2026), https://atpco.net/single-press/atpco-appoints-latam-airlines-group-executive-rosario-phillips-as-new-chair-of-the-board/ (last visited Nov. 18, 2026) [hereinafter *June 2026 Board Release*].

including the give-to-get policy described below.[105] On information and belief, airline ATPCO board member makes those decisions at the behest of its employer, and not as a dispassionate ATPCO overseer responding to the best interests of that separate entity. Per ATPCO's own characterization, its "board airlines" approved ATPCO's database using AWS Clean Rooms to "accelerate change in the airline pricing landscape."[106]

68. The airlines that sit on ATPCO's board are separately incorporated companies that compete with one another. Each director's decisions reflect not only an interest in ATPCO's success but also the interest of the director's own airline. Those interests are not necessarily aligned. Some airlines could gain, and others could lose, from a market in which an airline could win travelers through significant discounting before its competitors were able to mount a response. By deciding together whether and how airlines will share competitively sensitive shopping data, ATPCO's airline owners and directors replace independent decisions with joint ones, and the actions ATPCO takes with their approval are concerted action.

## VII. ATPCO built standards that route airlines' dynamic prices to ATPCO in common terms.

69. ATPCO was, by then, already developing its own model of dynamic pricing, one designed to route airlines' dynamic fares back through ATPCO. Its Elevate 2017 presentation first warned that dynamic prices hidden from competitors could set off a fare war among airlines.[107] It then offered an alternative: a pilot program in which dynamic prices would stay within ATPCO's

---

[105] *See, e.g.*, Press Release, ATPCO, ATPCO Leads Industry Transformation from Static Fare Filing to the Future of Airline Offers; Commits to Move Industry to 80% of All Airline Offers Dynamically Created by 2026 (Oct. 11, 2022), https://atpco.net/single-press/atpco-leads-industry-transformation-from-static-fare-filing-to-the-future-of-airline-offers-commits-to-move-industry-to-80-of-all-airline-offers-dynamically-created-by-2026/ (last visited Nov. 18, 2026) [hereinafter *October 2022 Release*] (referring to ATPCO's "Board-approved roadmap"); *April 2023 Board Release* (same).

[106] *Clean Rooms Release*.

[107] *2017 ATPCO Presentation* at slide 27.

view.[108] In the proposed pilot, an airline would file its fares with ATPCO as usual, its pricing engine would modify those fares, and the modified versions would go back to ATPCO as "private fares," a category ATPCO holds but does not release to the public. ATPCO's diagram of the pilot called this step "DPE Private Fare Filing."[109]




**Figure 8.** ATPCO diagram of a dynamic-price-adjustment pilot ("Pilot Approach 2 – Sabre-Farelogix-ATPCO"), including a step labeled "ATPCO Message Hub and DPE Private Fare Filing." *Source:* 2017 ATPCO Presentation at slide 8.

70. The practical result was that fares dynamic pricing would otherwise keep out of published fare data, and therefore out of rivals' sight, would continue to reach ATPCO from each airline individually. According to the Wittman Dissertation, "the ATPCO Working Group ha[d] proposed filing all DPE adjustments as private fares with ATPCO" to "ensure that DPE-adjusted fares can be tracked and verified."[110] "DPE" refers to a dynamic pricing engine.

---

[108] *Id.* at slides 34–35.

[109] *Id.* at slide 8.

[110] *Wittman Dissertation* at 27.

71. ATPCO made its first-ever acquisition in February 2018, the same month the Wittman Dissertation was finished, purchasing Routehappy, a company its press release described as a "Rich Content Provider." That release presented ATPCO as "the leading source for airline industry pricing and shopping data" and noted that "ATPCO is owned by airlines."[111]

72. In the years that followed, ATPCO, with help from the Working Group airlines, created a technical standard governing how dynamic prices would be recorded. A technical standard of this kind establishes uniform requirements for how one type of information is entered and stored. ATPCO's filed-fare system already operated on this principle, requiring every carrier to submit each fare in a uniform format with the same attributes, including booking class and fare rules. The new technical standard extended that uniformity to the prices an airline's software generates in real time in response to a traveler's search.

73. Under ATPCO's standard, dynamic prices were recorded using the same terms ATPCO had long applied to filed fares. An airline's pricing engine began with one of the airline's filed fares, termed the "baseline fare," and altered nothing but the price. Everything else carried over unchanged, including the booking class, the brand, and the change and refund rules, so that the adjusted fare's record was identical to the baseline fare's in every respect but cost.[112]

74. Shared terms for recording prices allows them to be compared. A rival airline that learns only of a quoted price lacks the context needed to interpret it, including the booking class and whether the ticket can be changed or refunded. As a result, the rival airline cannot discern whether the price reflects a steep markdown or a routine fare. ATPCO's standard closes that gap by enabling each quote to be recorded as a specific filed fare at a specific price, and ATPCO's data

---

[111] *Routehappy Release.*

[112] *DPE Guide* at 12, 19–21, 26.

already describe that filed fare's class and conditions. Because the standard applies uniformly to every participating airline, their dynamic prices could be lined up against one another.

75. ATPCO's own chief commercial officer has acknowledged this: "Two offers at the exact same fare can mean completely different things depending on whether you're buying a bare bones basic economy product or a fully flexible fare with bags. Same price, entirely different competitive situations." According to him, that "is where the ATPCO ecosystem becomes the foundation."[113]

76. ATPCO's own materials are candid about how airlines use standardized fare data: to keep watch on competitors and decide whether to react. According to ATPCO's implementation guidelines for adjusted offers, carriers rely on ATPCO fare data "for monitoring competitive activity . . . and to apply strategies to determine whether to respond to changing activity."[114] A separate ATPCO dynamic pricing guide advises that an airline's fare-management planning should cover "the airline's own fares as well as other airlines' fares for competitive monitoring," and that "[a]n airline may choose to implement proprietary business rules to automatically respond (match batch) to competitor actions."[115] ATPCO took it a step further and offered competitive monitoring as a product for sale to airlines. It marketed MarketView as a way for airlines to "look into changes

---

[113] *Shopping Data for Winning Strategies: Enable Better Competitive Insights*, ATPCO Elevate 2026 (Apr. 21, 2026) (session transcript), https://elevate.atpco.net/sessions/shopping-data-for-winning-strategies-enable-better-competitive-insights-d1715 (last visited Nov. 18, 2026) [hereinafter *Elevate 2026 Transcript*].

[114] ATPCO, *Adjusted Offers: Guidelines for Implementation* v1.1 (rev. June 2025), § 9.3, https://prodmedia.atpconet.atpco.net/wp-content/uploads/media/2025/01/03161915/AdjustedOffers_Guidelines-Implementation_v1.1.pdf (last visited Nov. 18, 2026) [hereinafter *Adjusted Offers Guidelines*].

[115] ATPCO, *Optimized Pricing via Dual RBD Implementation Guide* v3.1 (rev. Mar. 2025), § 5.7.1, https://prodmedia.atpconet.atpco.net/wp-content/uploads/media/2025/01/19153053/dynamic-pricing-dual-rbd_implementation-guide_v3.1c.pdf (last visited Nov. 18, 2026) [hereinafter *Dual RBD Guide*].

that are happening in competitive markets they are targeting, and even set up email alerts for when those changes happen."[116]

77. ATPCO had settled on a destination for those prices by 2018: they would flow to ATPCO while staying out of publicly available fare data. At an IATA meeting that September, ATPCO presented its plan, under which fares used in dynamic pricing would be left out of both the GDSs and published fare data.[117] For decades, competing airlines had been able to see their rivals' filed fares through ATPCO's data, but these fares would no longer be visible to them there, even though ATPCO itself would continue to receive them.

78. The standard ATPCO released the following year provided for the dynamic prices that airlines' engines quoted to travelers to be kept by ATPCO. In September 2019, ATPCO announced that its guide to the standard was "now live," and trade press reported that the standard would let airlines send "the adjusted ticket price into the standardized pricing system."[118] The guide gave airlines two ways to report adjusted prices to ATPCO: they could upload a fare record, or they could forward a copy of every interaction between the airline's pricing engine and the system requesting a price. These copies displayed both the baseline fare and the adjusted

[116] Marcelo Franceschini Freire, *Expert's Vlog, Part 5 of 5: Save Hours a Day with Four Tools for Managing Your Pricing Data*, ATPCO Blog (June 16, 2020), https://web.archive.org/web/20251208224800/https://atpco.net/single-blog/experts-vlog-part-5-of-5-save-hours-a-day-with-four-tools-for-managing-your-pricing-data/ (last visited Nov. 18, 2026).

[117] *2018 IATA Presentation* at 25.

[118] Press Release, ATPCO, ATPCO Reduces Barrier to Entry for Airlines to Adopt Dynamic Pricing (Sept. 30, 2019), https://atpco.net/single-press/atpco-reduces-barrier-to-entry-for-airlines-to-adopt-dynamic-pricing/ (last visited Nov. 18, 2026) [hereinafter *2019 DPE Release*]; Robert Silk, *ATPCO Makes Strides in Dynamic Pricing*, Travel Weekly (Oct. 2, 2019), https://www.travelweekly.com/Travel-News/Airline-News/ATPCO-makes-strides-in-dynamic-pricing (last visited Nov. 18, 2026).

amount.[119] They also contained details about the traveler's search that accompanied the request to the engine, information the guide labeled "who is asking."[120]

79. ATPCO retained adjusted prices under the standard regardless of whether anyone purchased them. The guide directed ATPCO to compare each copy with the ticket-sales data airlines submit to it and to forward fares that resulted in sales to the airline's accounting systems. Where a fare had no corresponding sale, the guide specified that "ATPCO will not distribute the fare and will store it for historical/analytical purposes."[121] Revenue accounting and settlement both depend on a completed purchase: revenue accounting tracks the money an airline earns on each ticket, and settlement divides that money among everyone involved in the sale, such as the travel agency that booked the ticket and any partner airline operating part of the itinerary. The guide stated that waiting until a ticket is issued "is sufficient to support revenue accounting and settlement requirements."[122] ATPCO therefore had no accounting reason to hold onto a fare before a traveler bought it, yet it kept the unpurchased offers anyway.

80. Consider two hypothetical travelers shopping for seats on the same flight, for which the airline has filed a $249 fare. For the first traveler, the airline's engine lowers that fare by $45 and offers $204. For the second, it raises the fare by $37 and offers $286. If the airline reports through copies of its engine's interactions, ATPCO ends up with a record of both quotes, showing both the $249 fare the engine started from and the adjusted price. The first traveler completes the purchase, so ATPCO forwards that $204 sale for accounting. The second walks away, but ATPCO

---

[119] *DPE Guide* at 12.
[120] *Id.* at 20.
[121] *Id.* at 38.
[122] *Id.*

retains the $286 quote regardless. Under the process ATPCO developed, both are recorded at ATPCO in the same terms as every other participating airline's prices.

81. The standard also funneled every participating airline's dynamic prices into a single location. Each airline has access to its own dynamic prices but no means of gathering those of its rivals. Under ATPCO's standard, however, every participating carrier transmitted its adjusted prices to ATPCO, which retained both the offers travelers accepted and the ones they turned down.[123] Such a repository reveals not just what each airline actually charged but the full range of prices it was willing to charge. If multiple airlines had access to it, they would all be looking at the same view of the market. A price war can start when an airline cannot tell whether a competitor cut its price or demand simply fell.[124] Economic theory predicts that rivals who rely on a shared record of each other's prices should make that error less frequently and therefore trigger fewer of the price wars that lead to cheaper fares for travelers.[125]

82. ATPCO also expanded the amount of airline fare data flowing into its own products. Following what it described as "broad consultation with its airline owners," ATPCO introduced Architect in November 2020, a fare-management platform it promoted as able to standardize fare data drawn from multiple sources.[126] In January 2021, ATPCO acquired Airfare Insight, a tool SITA had marketed to airlines for spotting changes in competitors' fares, and integrated it into Architect.[127] That move tracked a prediction in the 2018 Wittman Dissertation

[123] *DPE Guide* at 12, 38.

[124] *2017 ATPCO Presentation* at slide 27; *Wittman Dissertation* at 197–98, 217–18.

[125] *Wittman Dissertation* at 197-98.

[126] *Architect Release*.

[127] Press Release, ATPCO & SITA, ATPCO Buys SITA's Airfare Insight (Jan. 14, 2021), https://atpco.net/single-press/atpco-buys-sitas-airfare-insight-acquisition-expands-atpcos-product-portfolio-and-delivers-efficiencies-to-airlines/ (last visited Nov. 18, 2026) [hereinafter *Airfare Insight Release*].

that technology resembling the fare-monitoring services then available to airlines would arise to keep watch on dynamic prices.[128] Twenty-seven airlines were using Architect by 2024.[129]

83. In October 2022, ATPCO unveiled a plan to extend its standardized format to the dynamic prices that fell outside its earlier standard.[130] The 2019 standard applied only to prices an airline's engine produced by modifying a fare previously filed with ATPCO.[131] Offers that an airline builds entirely on the spot in response to a search, without any filed fare beneath them, were left out. Business Travel News, covering ATPCO's announcement, described these offers as ones that "are generated at the time of search, instead of filed within ATPCO's system."[132] Because such an offer lacks a baseline fare in ATPCO's data, ATPCO's existing terms cannot describe it. ATPCO's solution, which it called airline order posting, would allow an airline to transmit the traveler's order to ATPCO, which would then translate it "into the current data formats."[133] As a result, once a traveler purchased one of these offers, it could be recorded in ATPCO's standardized terms just like any conventional fare, even though it originated outside ATPCO's system.

84. Order posting was part of ATPCO's announced plan to build the framework for 80% of all airline offers to be dynamically created by 2026.[134] ATPCO introduced the proposed

---

[128] *Wittman Dissertation* at 200.

[129] Press Release, ATPCO, ATPCO Reveals Premier Pricing Tool Architect Is the Fastest Growing Decision Support System (DSS) on the Market (July 23, 2024), https://atpco.net/single-press/atpco-reveals-premier-pricing-tool-architect-is-the-fastest-growing-decision-support-system-dss-on-the-market/ (last visited Nov. 18, 2026).

[130] *October 2022 Release*.

[131] *DPE Guide* at 12, 19–21, 26; *2019 DPE Release*.

[132] Donna M. Airoldi, *ATPCO Commits to 'Dynamic' Airline Offers*, Bus. Travel News (Oct. 11, 2022), https://www.businesstravelnews.com/Distribution/ATPCO-Commits-to-Dynamic-Airline-Offers (last visited Nov. 18, 2026).

[133] *October 2022 Release*.

[134] *Id.*

solution alongside its "Board-approved roadmap for new standards," identifying order posting as one of the initiatives it was developing to achieve that industry-wide goal.[135]

85. ATPCO's airline board had signed off on the objective behind these initiatives by 2022. Writing in July 2022, ATPCO's chief executive reported that the plan to develop a framework for dynamically created airline offers had been "approved by our board of directors," and that ATPCO would carry it out by "leveraging the data airlines trust us with."[136]

## VIII. ATPCO's board airlines approved pooling shopping data in AWS Clean Rooms.

86. In June 2023, Mr. Gregorson, ATPCO's chief strategy officer, published a post titled "The growth of dynamic offers (and pricing) requires an industry solution."[137] He was no stranger to the subject, having headed ATPCO's dynamic pricing session at Elevate 2017.[138] In the post, he noted that airlines had "built very sophisticated processes that understand the prices and products that are in the market," and warned that, without those prices, airline systems "will generate inaccurate forecasts and price recommendations." He added that the issue was "compounded by the fact that airlines making the inaccurate reactions then impact all other airlines who are forced to react to these prices."[139]

87. The difficulty Gregorson identified is one that every airline in a competitive market normally confronts, and resolves, independently. Any seller must choose a price without knowing precisely what its competitors will charge, and it absorbs the consequences if it guesses wrong.[140]

---

[135] *Id.*

[136] Zoghlin, *Changing the Game*.

[137] Tom Gregorson, *The Growth of Dynamic Offers (and Pricing) Requires an Industry Solution*, ATPCO (June 9, 2023), https://web.archive.org/web/20260309180336/https://atpco.net/single-blog/the-growth-of-dynamic-offers-and-pricing-requires-an-industry-solution/ [hereinafter *Gregorson Industry-Solution Post*].

[138] *2017 ATPCO Presentation* at slides 1–2.

[139] *Gregorson Industry-Solution Post.*

[140] *See id.*

Set fares too high and an airline loses passengers to competitors; set them too low and it gains passengers at their expense. In both cases, the market corrects the mistake through competitors' reactions, with no sharing of prices required. Suppose two airlines serve the same route, each with a $450 filed fare. Unable to see its rival's prices, one airline's engine quotes a traveler $395. What the post characterizes as an "inaccurate reaction" is, from the traveler's perspective, simply a cheaper ticket. The rival airline, losing bookings it had counted on, cuts its own prices to compete, which is what the post describes as being "forced to react."[141] It is precisely this uncertainty about competitors' pricing that makes undercutting an attractive strategy,[142] and economists have long identified the difficulty of detecting rivals' price cuts as a key barrier to coordination among competitors.[143] An industry-wide fix would supply each airline with the visibility into competitors' prices that none of them has independently.

88. Less than six weeks after Mr. Gregorson called for an "industry solution," ATPCO took action. In a July 21, 2023 announcement, ATPCO disclosed that its board airlines had signed off on an initial move toward combining airlines' shopping data. As the announcement framed it, this step would create a shared space for joint analysis, with ATPCO offering to "provide airlines with access to AWS Clean Rooms to collaborate and analyze their collective datasets."[144] AWS Clean Rooms, offered by Amazon Web Services, allows multiple companies to run analyses on their pooled data according to terms the participants agree on. According to the release, "ATPCO has the support of its 11 board airlines who have approved the first step," and that "multiple airlines" were "already providing their shopping data, including dynamically generated

---

[141] *See id.*

[142] *See Wittman Dissertation* at 191–93, 197–98.

[143] George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44 (1964), https://www.journals.uchicago.edu/doi/10.1086/258853 (last visited Nov. 18, 2026).

[144] *Clean Rooms Release*.

pricing[.]"[145] ATPCO explained its rationale this way: "airlines need additional data to augment the existing intelligence used to create fares and offers."[146]

89. In the ATPCO-administered clean rooms, airlines would jointly analyze their shopping data, which records the searches travelers ran and the prices each carrier quoted in response. ATPCO later described this data as encompassing "airline shopping request and response messages from the source where they're generated."[147] The request is what the traveler searched for, and the response consists of the offers the airline sent back, each with a price attached.[148] As a result, an airline's shopping data captures every price it quoted to every traveler who searched, regardless of whether a ticket was ultimately purchased.

90. Absent some form of cooperation, rival airlines have no access to that record. Imagine one traveler searches for a flight and receives a $275 quote, and an hour later another traveler searches for the same flight and receives a $338 quote. Neither traveler sees anything beyond their own quote. rival airline curious about the first airline's pricing could run its own search for that flight, either manually or through automated search software, but it would see only the price returned to its own query. It would have no idea that the two travelers had searched, much less what they were quoted. That information resides only with the airline and the booking systems that processed the two searches.

91. ATPCO laid out the terms of the arrangement for airlines in the fall of 2023: those that supplied data would get insights back. During a session at ATPCO's Focus Summit+ 2023 titled "Dynamic demands: New data types we'll need to support dynamic offers" (the "October

[145] *Id.*

[146] *Id.*

[147] *Adjusted Offers Guidelines* at 9.

[148] *See id.*

2023 Session"), an ATPCO presenter walked through how it would operate. ATPCO would bring in airlines and other systems as participants, each of which would set "[a]nalysis rules, what can be accessed, what columns you want to share." Then, he said, "[o]nce the data is in the clean rooms, at this point, ATPCO can do further processing and create the competitive insights and apply models like give-to-get model . . . where depending on . . . which airlines and systems are contributing, they get access to the insights."[149]

92. The presenter also previewed what participating airlines would see in return. "We summarize this data and created something called 'price ladder,'" he said. "[I]n this price ladder, each one of the price points you would be able to see how many competitors are there, as well as who the competitors are." The ladder was "especially to fill the gap into competitive insights. Especially where dynamically adjusted prices and dynamic offers are in the market."[150]

93. According to ATPCO, the arrangement responded to something the airlines themselves were asking for. At the start of the October 2023 Session, Daphne Nothwehr, a senior product strategy manager at ATPCO, put it this way: "[F]rom a competitive data standpoint, airlines need and they want to have a complete view of their own prices alongside their competitor prices in the marketplace."[151]

94. ATPCO reported that a number of airlines, among them major North American carriers, had already signed on. Mr. Gregorson referred to a pilot that ATPCO was conducting "right now with several airlines using AWS Clean Rooms."[152] A different ATPCO presenter

---

[149] ATPCOnews, *Focus Summit+ 2023: Dynamic Demands: New Data Types We'll Need to Support Dynamic Offers*, YouTube (Oct. 30, 2023), at 22:25–23:45, https://www.youtube.com/watch?v=bm2FK5Qn4Rk (last visited Nov. 18, 2026) [hereinafter *October 2023 Session*].

[150] *Id.* at 15:12–16:02.

[151] *Id.* at 3:20–3:45.

[152] ATPCOnews, *Focus Summit+ 2023: State of the Industry Update*, YouTube (Oct. 30, 2023), at 20:50, https://www.youtube.com/watch?v=_Sd2BGSFSqA (last visited Nov. 18, 2026).

mentioned that ATPCO had started collaborating with "some major airlines in Northern America."[153] ATPCO also indicated that a single partner airline produced "around 7 terabytes of data per day" of shopping data.[154]

95. Earlier in the same session, Ms. Nothwehr told the audience that ATPCO had brought Dr. Belobaba—the PODS Study's first-listed author and the supervisor of the Wittman Dissertation—back to advise it. She said ATPCO had "recently had industry expert Dr. Peter Belobaba in to work with us," and that in a recent ATPCO webinar he had said:[155]

> The "Holy Grail" is to get the dynamic price and product determination based on more contextual information, which will require more data and more detailed market information. . . . [S]ignificant improvements are needed to current data sources that will be required to enable forecasting and optimization models and improve revenue management for the future that will drive us to more dynamic offers. . . . [W]e simply just don't have the data we need. So, new data sources will be required.[156]

96. According to Ms. Nothwehr, Dr. Belobaba had "specifically called out a need for improved competitive data and the potential for shopping data"—the data the clean-rooms program was designed to collect.[157]

---

[153] *October 2023 Session* at 24:12.

[154] *Id.* at 14:15.

[155] *Id.* at 3:56.

[156] *Id.* at 4:38–5:16.

[157] *Id.* at 5:16–5:24.




**Figure 9.** Still from the October 2023 Session (player time 4:09) showing a slide quoting Dr. Peter Belobaba: "The 'Holy Grail' is to get to dynamic price and product determination based on contextual information, which will require more data and much more detailed market information." *Source:* October 2023 Session, at 4:09.




**Figure 10.** Still from the October 2023 Session (player time 4:58) showing a slide quoting Dr. Belobaba: "We have started the research, but we don't have the data." *Source:* October 2023 Session, at 4:58.

**IX. In Fort Worth, ATPCO's chief executive pitched the give-to-get program as a way for rivals to see each other's prices.**

97. In remarks to an industry audience on November 1, 2023, at the Skift Aviation Forum in Fort Worth, Texas, Alex Zoghlin, ATPCO's chief executive, explained that the program would grant airlines visibility into what their competitors were up to.[158] The session was held at the Omni Fort Worth hotel and hosted with DFW, in a session presented with AWS.[159] Mr. Zoghlin opened his remarks by examining the risks presented by dynamic pricing. He pointed to United, a member of ATPCO's board, which had begun pricing dynamically in real time and thereby forced airlines "to respond . . . to an airline that you don't know what their pricing is anymore."[160] He noted that most airlines were receiving only "a feed once a day" of their competitors' fares, either from ATPCO or other providers. To his mind, building a pricing model upon that infrequent feed while a competitor's prices change with each search was "not going to work."[161]

98. To address this mismatch, he said, ATPCO had "entered into a program because we're airline-owned," a program he described as "what we call a give to get model," whereby airlines "send their shopping data, which is now dynamically generated, into . . . clean rooms," where ATPCO "can help them mesh it." Mr. Zoghlin saw that program as enabling ATPCO to "continue what we call a transparent market so you can see what your competitors are up to, your competitors can see what you are up to and pricing can maintain at least the transparency that both

---

[158] *Skift Session*.

[159] Brian Quinn, *Don't Miss Skift Aviation Forum on Nov. 1 in Fort Worth, TX*, Skift (Oct. 20, 2023), https://skift.com/2023/10/20/dont-miss-skift-aviation-forum-on-november-1-in-fort-worth-tx/ (last visited Nov. 18, 2026); *Charting New Territory*; *Skift Forum Video Article*.

[160] *Skift Session* at 5:43.

[161] *Id.* at 6:44–8:26.

customers and airlines and their revenue systems are used to doing."[162] He then explained the importance of centralizing industry fare data:[163]

> In the old ATPCO world we would distribute this data. We still do distribute this data. When [pricing] starts to go dynamic, that data set is so big, ten terabytes per carrier multiplied by the 450 in our system, you're talking about petabytes of data that's generated in a single day. You have to flip the paradigm. Only companies like Amazon are capable of managing that size of data. So we're now asking carriers: instead of us distributing the data to you, bring your compute to us and the data can sit in one place and we don't have to replicate it.

99. "Having one company that's utility owned by the industry that can manage it," he argued, "is really what's going to help all of us long term."[164]

100. What Mr. Zoghlin described in Fort Worth was the framework that ATPCO's research had identified in 2017 PODS study and 2018 dissertation as the optimal way to avoid price wars while maintaining the advantages of dynamic pricing. A firm that discounts prices in a competitive information vacuum captures gains, which makes discounting worth trying.[165] Every competitor has the same incentive to reduce prices: in ATPCO's 2017 example, two airlines spiraled downward into a price war until the offer price reached marginal cost.[166] With price visibility, on the other hand, competitors see the discount and the airline that made the cut captures no benefit.[167] As it proposed, by 2023 ATPCO was implementing the "information market" solution it had researched a few years prior, a solution that, as its chief executive described it,

---

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *2017 ATPCO Presentation* at slide 27.

[166] *See id.*

[167] *See id.*

would let each airline see what its competitors were doing and let those competitors see the same about it.[168]

**X. ATPCO acquired 3Victors and put it in charge of the shopping data program.**

101. In December 2023, ATPCO acquired 3Victors as part of the information exchange buildout, incorporating 3Victors' airline shopping data.[169] ATPCO characterized the acquisition as a part of that project: "This acquisition follows the recent announcement that ATPCO is leveraging AWS Clean Rooms to enable ATPCO and participating airlines to analyze their collective shopping insights."[170] Responding to the changing pricing framework, ATPCO's chief executive explained that with the transition to dynamic pricing, "there will be a gap in the current data to maintain accurate pricing."[171]

102. ATPCO acquired 3Victors' own data as part of the purchase, data that would provide "a real-time response of industry travel demand while supplementing fares not currently filed through ATPCO."[172] Prior to the merger, 3Victors was already collecting significant volumes of airline shopping data: by 2019, it boasted collecting "over 1 billion worldwide travel searches and 200 billion itineraries in real-time DAILY."[173] In the words of a report on the deal (which ATPCO reproduced on its own website), 3Victors' information "feeds in to airline pricing and revenue management systems."[174]

---

[168] *Skift Session* at 6:44–8:26.

[169] *3Victors Acquisition Release*.

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] Rick Seaney, *A Travel Tech CEO's Journey from Cloud Skeptic to Evangelist*, AWS for Industries (Oct. 11, 2019), https://aws.amazon.com/blogs/industries/a-tech-ceos-journey-from-cloud-skeptic-to-evangelist/ (last visited Nov. 18, 2026).

[174] *See, e.g.*, T2RL, *First View: ATPCO Accelerates Its Transformation with 3Victors* (Dec. 2023), https://web.archive.org/web/20240611045616/https://www.atpco.net/sites/atpco-public/files/all_pdfs/t2rl-first-view-atpco-accelerates-its-transformation-with-3victors.pdf (last visited Nov. 18, 2026); Richard

103. Shortly following the acquisition, 3Victors took the reins in operating the shopping-data program within ATPCO. In January 2024, ATPCO's Mr. Zoghlin stated the company's purchase of 3Victors "will position ATPCO as the industry's leading source of competitive airline pricing and shopping data."[175] Then, in April of that year at ATPCO's Elevate + TravelConnect conference, Ms. Nothwehr recalled that "at our last conference, we highlighted some of the data experiments that ATPCO had been working on," including "discovery work we're doing with the AWS Clean Rooms."[176] She updated the room on the progress that had been made in the time since, noting that 3Victors was operating the trials ATPCO had been running with airlines' shopping data. The industry calls a trial like this, with limited participation designed to test the viability of a product before wider distribution, a proof of concept ("POC").[177] According to Nothwehr,, 3Victors was now "driving primarily the shopping data POCs that we had going on."[178]

104. By late 2024, ATPCO was touting its new capabilities to the industry, advertising 3Victors to airlines as allowing them to measure their fares against those of their competitors. At its Focus Summit+ in Istanbul that year, ATPCO's chief executive noted that "we have things like 3Victors that allows you to compare what you look like in the market to your competitive set."[179] Another key ATPCO executive asked the assembled airline representatives: "Why are we all doing

---

Clark, *T2RL's Guest Blog: ATPCO Accelerates Its Transformation with 3Victors*, ATPCO (Feb. 26, 2024), https://web.archive.org/web/20251111115207/https://atpco.net/single-blog/t2rls-guest-blog-atpco-accelerates-its-transformation-with-3victors/ (last visited Nov. 18, 2026).

175 Alex Zoghlin, *A Year of Acceleration and Innovation*, ATPCO (Jan. 10, 2024), https://web.archive.org/web/20260217021142/https://atpco.net/single-blog/a-year-of-acceleration-and-innovation/ (last visited Nov. 18, 2026).

176 ATPCOnews, *Elevate + TravelConnect: Date Meets AI: Key Characters in the Airline Industry*, YouTube (May 30, 2024), at 35:06–35:40, https://www.youtube.com/watch?v=U-jP5T0DdG8 (last visited Nov. 18, 2026) [hereinafter *2024 Elevate Data Session*].

177 *Id.*

178 *Id.* at 35:40–35:53.

179 ATPCOnews, *A Welcome by ATPCO President and CEO, Alex Zoghlin*, YouTube (Nov. 19, 2024), at 6:01, https://www.youtube.com/watch?v=b7WfwovQeds (last visited Nov. 18, 2026).

those efforts independently with holes in the data, with blinders on . . . and doing it just looking at our own data?”[180] ATPCO’s chief commercial officer said that “in the new world where I have fragmented content and I’m changing my fares dynamically or continuously,” 3Victors helps “identify for airlines and distribution channels . . . what is actually available in the market right now on a real-time basis. How’s it look on a competitive basis to other players in the market?”[181]

105. In 2026, before a group of airline representatives, ATPCO’s chief commercial officer, Chris Phillips, explained the acquisition in terms of what ATPCO’s infrastructure had lacked: ATPCO had spent “years . . . building an infrastructure to decode what an offer actually is . . . beneath the price, down to the atomic construction of the fare.” He said what they had built “is not just a data feed. This is a competitive intelligence infrastructure,” but missing a “critical piece”, namely, visibility into what was actually happening in the market. “Knowing what you and your competitors have built as offers is foundational, but knowing how the market is actually responding to those offers in near real-time across every channel . . . that’s a different capability entirely. And that’s exactly why ATPCO acquired 3Victors.” According to him, ATPCO aimed “to close this loop”: “3Victors surfaces what’s happening in the market at the speed the market demands. ATPCO decodes what it means, and together, for the first time, you have a complete real-time picture of the competitive reality.”[182]

---

[180] ATPCOnews, *Data Innovation: The Key to Unlocking Competitive Advantage*, YouTube (Nov. 19, 2024), at 14:57–16:09, https://www.youtube.com/watch?v=8ZrsRp7Y1io (last visited Nov. 18, 2026).

[181] ATPCOnews, *AI’s Revolution in Competitive Intelligence: Maximizing Impact While Managing Risks*, YouTube (Nov. 19, 2024), at 21:04–21:39, https://www.youtube.com/watch?v=iuievR56M54 (last visited Nov. 18, 2026).

[182] *Elevate 2026 Transcript*.

## XI. Iris pools airlines' nonpublic shopping data and returns rivals' data in proportion to what each airline contributes.

106. In December 2024, ATPCO transformed the shopping-data program that had begun in the AWS clean rooms into a product called Iris. ATPCO's chief commercial officer introduced Iris on 3Victors' website as "the industry's only AI powered shopping data repository" and reported that airline participation "has increased by more than 5X this year with [a] growing pipeline of airlines engaged in connecting with our network."[183] Eight months earlier, ATPCO had told airlines that 3Victors was running the shopping-data trials ATPCO had begun in the clean rooms.[184] Iris collects the same kind of data the clean rooms did—airlines' dynamically generated shopping data—and makes it available on the give-to-get terms ATPCO had described in 2023.[185]

107. In April 2025, 3Victors' co-founder described Iris as "an airline-owned shopping data repository that delivers complete, timely, and accurate real-time competitive data." He presented Iris as the alternative to scraping competitors' websites: "Instead of playing defense by blocking bots while trying to scrape competitors, airlines that contribute to Iris receive enriched competitive shopping data—collected at higher volume and velocity[.]"[186]

108. 3Victors' website says that Iris is not "just a data repository" but "a strategic advantage."[187] Until at least October 4, 2026, the website also stated that Iris combines

[183] Chris Phillips, *Reflecting on 2024: A Year of Innovation and Milestones for 3Victors*, 3Victors Blog (Dec. 13, 2024), https://www.3victors.com/blog/reflecting-on-2024-a-year-of-innovation-and-milestones-for-3victors (last visited Nov. 19, 2026) [hereinafter *3Victors 2024 Review*].

[184] *2024 Elevate Data Session* at 35:40–35:53.

[185] *See October 2023 Session* at 22:25–23:45; *Skift Session* at 6:44–8:26; *3Victors Acquisition Release*.

[186] Rick Seaney, *AI Agents and Airline Shopping: 2025's Big Disruption*, 3Victors (Apr. 23, 2025), https://www.3victors.com/blog/ai-agents-airline-shopping-2025-big-disruption (last visited Nov. 19, 2026).

[187] *3Victors Data Page* ("Iris Flight Shopping Data" tab).

"proprietary, partner, and participant-based data into a single standardized stream of flight shopping data."[188] That language has since been removed.




**Figure 11.** 3Victors web page describing the "Iris Flight Shopping Data Repository" and its "Data sources," including "Direct airline APIs—Shopping data sourced directly from airline systems" and "Streaming data feeds—Continuous shopping data from carrier platforms and partners." *Source: Archived 3Victors Data Page.*

109. 3Victors describes that it was acquired by ATPCO in 2023 and explains how Iris works in a white paper titled "The Competitive Intelligence Crisis" (the "3Victors White

---

[188] *Data*, 3Victors (archived Oct. 4, 2026), https://web.archive.org/web/20261004074310/https://www.3victors.com/data [hereinafter *Archived 3Victors Data Page*].

Paper").[189] The paper addresses airlines that have lost the ability to see one another's prices that filed fares once gave them. It quotes an American Airlines executive: "Understanding the lowest selling fare is no longer enough."[190] An Air Canada executive explains that "the price will likely change more frequently with the rise of continuous and other dynamic pricing," and that "that is going to require a new type of data exchange."[191]

110. Airlines had tried to fill the gap with scraping: programs that search airline and travel websites as a traveler would and record the prices displayed. A scraper sees only what any traveler could see, one search at a time. The paper states that "the currently popular practice of web scraping to gather competitive information is unsustainable," that it leaves airlines "unable to get a full picture of competitive offers," and that it "delay[s] competitive insights by days."[192]

111. The 3Victors white paper says that Iris is "an industry-neutral, cost-effective shopping data repository."[193] 3Victors' website further provides that airlines should jump on board because "[d]ynamic pricing demands dynamic data."[194]

---

[189] *3Victors White Paper*.

[190] *Id.* at 8.

[191] *Id.* at 7.

[192] *Id.*

[193] *Id.* at 9.

[194] *3Victors Data Page* ("Why contribute?" tab).




**Figure 12.** 3Victors web page stating participating airlines can "confidently monitor the competitive landscape and adjust pricing strategies as markets shift—hour by hour, not day by day." *Source:* 3Victors Data Page ("Why contribute?" tab).

112. Iris receives far more than the filed fares ever showed. A filed fare was a single price, available to every traveler. The 3Victors White Paper, in contrast, defines shopping data as "time-stamped flight search and results data generated whenever a shopping request occurs and a system returns offers for air travel." This data includes the traveler's search "search request" and the airline's "detailed offer response," which together record the dates and times of travel, the airlines and flight numbers, the cabin, the number of passengers, and each fare with its taxes, fees, and surcharges, among other details.[195] On top of this, "Iris data contains all offers returned from a shopping request, including all brands, cabins, and price points, unlike web-scraping techniques that most often pull the limited offer content presented to customers, typically at the lowest available price."[196]

---

[195] *3Victors White Paper* at 10.

[196] *Id.*

113. The offers Iris collects from airlines' own systems include the airlines' dynamic prices. A dynamic price exists only as the price an airline's system returns when a traveler searches; it appears nowhere except in the airline's response to that search. According to the 3Victors White Paper, "Iris data is sourced directly from airline and GDS calls."[197] Until at least October 4, 2026, 3Victors' website listed among Iris's sources "[s]hopping data sourced directly from airline systems" and "[c]ontinuous shopping data from carrier platforms and partners," with web scraping used to fill gaps.[198] 3Victors' head of business development said that "[p]rimarily, we're interacting with streaming content coming directly from airlines themselves."[199]

114. Unlike a filed fare, most of the data Iris receives is never made public. That includes the searches themselves and each airline's responses to them, with dynamic prices that appear nowhere else. Only the traveler who searched saw the prices returned to that search; a competitor searching the same flight sees only the prices returned to its own search. Airlines also try to deny rivals even the limited view a scraper gets. According to 3Victors, airline websites "typically block" bots "to prevent competitors from web scraping their shopping data," and "[m]any airlines employ web scraping where they can but also have controls in place to limit web scraping on their own site[.]"[200]

115. Iris gives an airline its competitors' data only if the airline contributes its own, and only in proportion to what it contributes. The 3Victors White Paper states that "[b]y contributing their own shopping data, participants will be able to receive competitive data at higher volume,

---

[197] *Id.*

[198] *Archived 3Victors Data Page.*

[199] 3Victors, *Webinar: Exploring the New PriceEye Dashboard* (July 31, 2025), at 8:53–8:59, https://www.3victors.com/webinar-on-demand---exploring-the-new-priceeye-dashboard (last visited Nov. 20, 2026) [hereinafter *PriceEye Dashboard Webinar*] (remarks of Stan Barnes, Head of Business Development, 3Victors).

[200] *3Victors White Paper* at 6, 7.

velocity, and variety[,]" and that "[p]articipants receive shopping data commensurate with the participating airlines, volume, velocity[,] and comprehensiveness of the data they provide."[201] Its diagram of "How Iris works" in the white paper is labeled "Must Contribute," "Full Content," and "Full Network," with arrows marked "Contribute" and "Receive" that point in opposite directions.[202]




**Figure 13.** 3Victors White Paper page "Competitive intelligence built for the future," including the "How Iris works" diagram ("Must Contribute," "Full Content," "Full Network"; arrows marked "Contribute" and "Receive"). *Source: 3Victors White Paper* at 9.

---

[201] *Id.* at 9.

[202] *Id.*

116. 3Victors' website states: "Participation in Iris is based on a simple principle: the more you contribute, the more you receive."[203]




**Figure 14.** 3Victors web page "How contribution works": "Participation in Iris is based on a simple principle: the more you contribute, the more you receive." *Source:* 3Victors Data Page.

117. The 1994 Decree had tied what an airline could learn about its competitors through ATPCO to what the public could see. ATPCO could provide information only for fares that were actually for sale. It could not show an airline a competitor's fare change before sending that change to the systems travel agents used, and it could not give an airline information about its rivals' fares that the travel agents selling those fares did not also have visibility of.[204] In contrast, Iris ties what information an airline is provided to what information the airline contributes. So a contributing airline receives its competitors' searches and offers, including every offer a competitor's system returned.

---

[203] *3Victors Data Page* ("How contribution works").

[204] *1994 Decree* § IV(B).

118. Iris's data delivery is also much more current. The 3Victors White Paper boasts that shopping data "is collected throughout the day, enabling multiple daily feeds and eliminating the need to perform web scraping in a small shopping window of the day and providing real-time market intelligence to inform airline decision making."[205]

## XII. PriceEye shows each participating airline its rivals' prices, carrier by carrier, and flags undercuts.

119. 3Victors sells PriceEye, a product that shows an airline its competitors' fares, pricing changes, and future pricing and availability. PriceEye lets airlines move "from making decisions based on hours-old scraped data to the real-time AI-powered analytics necessary to take full advantage of dynamically generated offers."[206] 3Victors' website promises contributors insight "hour by hour, not day by day."[207] Before the 1992 Action, according to DOJ, the airlines used ATPCO's data to produce "detailed daily reports" of competitors' fare changes.[208]

120. Speed matters. An airline that undercuts a rival keeps the travelers it wins only until the rival learns of the cut and matches it.[209] If the rival learns of the cut days later from scraped data, the airline that cut keeps those travelers for days. If the rival learns within hours, the gain lasts hours, and the cut is hardly worth making. The economic research on which the Wittman Dissertation relied predicts that the more clearly firms can see one another's price cuts, the less often price wars start.[210] In ATPCO's 2017 illustration, each airline answered the other's last cut.[211] Iris shortens the time between a competitor's cut and the moment an airline can see and answer it.

---

[205] *3Victors White Paper* at 10
[206] *Id.* at 11.
[207] *3Victors Data Page* ("Why contribute?" tab).
[208] *1994 Federal Register Notice.*
[209] *See 2017 ATPCO Presentation* at slide 27.
[210] *See Wittman Dissertation* at 197–98.
[211] *2017 ATPCO Presentation* at slide 27.

121. ATPCO markets PriceEye for this purpose. In 2026, its chief commercial officer described the problem PriceEye addresses: "Something shifts in the market. A competitor moves. Your analysts know something's changed, but finding it, understanding it, and acting on it can take hours and sometimes even days." With PriceEye, he said, "competitive shifts surface automatically," and the airline is "pointed directly to what's changed and what it means in minutes, not in days. Every hour of lag is an hour of missed opportunity. PriceEye eliminates that lag."[212]

122. Airlines receive Iris data through PriceEye. 3Victors offers Iris data to "PriceEye customers that contribute shopping data to Iris."[213] ATPCO describes PriceEye as "3Victors' pricing intelligence solution built on Iris shopping data."[214] PriceEye predates Iris: Alaska Airlines had signed on to PriceEye by July 2024, before Iris was introduced.[215] Once Iris existed, airlines buying PriceEye could contribute their own shopping data and receive their competitors' in return.

123. PriceEye delivers competitors' prices to each airline in two ways: as a data feed into the airline's own systems and, since July 2025, through a dashboard built on the same data. In the words of 3Victors' head of business development, the customer's "input file contains the instructions about what information you seek for us to collect on your behalf. So, that would be inclusion of which competitors . . . ."[216]

---

[212] *Elevate 2026 Transcript*.

[213] *3Victors Data Page* ("Iris Flight Shopping Data" tab).

[214] *PriceEye Session Page*.

[215] Press Release, *Alaska Airlines Signs PriceEye Deal with 3Victors*, 3VICTORS (July 11, 2024), https://www.3victors.com/post/alaska-airlines-signs-priceeye-deal-with-3victors (last visited Nov. 19, 2026) [hereinafter *Alaska Price Eye Release*].

[216] *PriceEye Dashboard Webinar* at 7:52–8:21.




**Figure 15.** 3Victors webinar slide "PriceEye – How It Works," the slide states that "[e]verything here is configurable down to the customer/profile level." *PriceEye Dashboard Webinar* at 7:55–12:45.

124. 3Victors' diagram of "How PriceEye works" gives an overview of the customer's input file and Iris feeding PriceEye. PriceEye filters the data, including by carrier, and delivers it to the airline's own systems.[217] Most PriceEye customers load this data directly into their own systems. As 3Victors' head of business development explained, "[m]ost of our customers are receiving data directly into their systems or their endpoints. Typically, that's conducted through an S3 or an SFTP environment."[218]

125. Before the data reaches customers, PriceEye cleans it and adds to each competitor's offer the fare information ATPCO uses for filed fares. 3Victors' diagram shows each offer being supplemented with its taxes, fare basis code (the code that identifies a filed fare and its rules),

[217] *3Victors Data Page* ("How PriceEye works" diagram).

[218] *PriceEye Dashboard Webinar* at 11:53–12:02. S3 (Amazon's cloud file-storage service) and SFTP (a secure protocol for transferring files between computers) are standard ways of delivering data files automatically into a company's own storage.

booking class, and brand.[219] Booking class, brand, and fare rules are the details ATPCO's standards attach to each filed fare and to each dynamic price recorded under them.[220] In 2026, ATPCO's video explaining PriceEye stated that it uses "industry data enriched with brands, taxes, and fare rules from ATPCO."[221]

126. PriceEye's dashboard is built for comparison, showing each airline its competitors' current and future prices, competitor by competitor. Each customer chooses whom to watch: its input file "contains the instructions about what information you seek for us to collect on your behalf," including "which competitors."[222] A 3Victors product manager described a PriceEye view that "is using the lowest price per day per carrier,"[223] and PriceEye's summary views can be filtered by carrier.[224] Until at least October 4, 2026, 3Victors' PriceEye webpage invited airlines to "[v]iew future pricing and availability to identify competitive gaps, optimize positioning, and act before competitors do," and stated that PriceEye's artificial intelligence "surfaces sudden shifts, outliers, and undercuts."[225]

---

[219] *3Victors Data Page* ("How PriceEye works" diagram).

[220] *See DPE Guide* at 12, 19–21, 26.

[221] ATPCOnews, *How 3Victors' PriceEye Works*, YouTube (Oct. 5, 2026), at 2:04–2:13, https://www.youtube.com/watch?v=xaL7lEk4Y28 (last visited Nov. 19, 2026) [hereinafter *How PriceEye Works Video*].

[222] *PriceEye Dashboard Webinar* at 7:57–8:12.

[223] *Id.* at 27:52–28:02.

[224] *Id.* at 32:40–34:05.

[225] *PriceEye*, 3Victors (archived Oct. 4, 2026), https://web.archive.org/web/20261004074310/https://www.3victors.com/priceeye [hereinafter *Archived PriceEye Page*].




**Figure 16.** 3Victors PriceEye web page section "Analytics built for action." *Archived PriceEye Page* (Oct. 4, 2026 capture).

127. 3Victors' "Price Outlook" screens show competitors' prices for future departure dates.[226]

[226] *PriceEye Dashboard Webinar* at 27:29–27:57.




**Figure 17.** "Price Outlook" screens displayed during 3Victors' PriceEye dashboard webinar, charting fares by carrier across future departure dates. *PriceEye Dashboard Webinar* at 27:29–27:57.

128. PriceEye is built to find instances in which a competitor has offered a lower price. 3Victors lists "[m]arket undercuts and overpricing" among what PriceEye shows.[227] When the dashboard launched, a trade publication reported that it let pricing teams "uncover instances where competitors offered lower fares."[228] In 2026, ATPCO's video showed PriceEye telling an airline that "your discount buckets are closed while your competitor is still selling from lower ones"—

---

[227] *3Victors PriceEye Page* ("How PriceEye works" section, "Insights" tab).

[228] Melinda Healy, *3Victors Launches PriceEye Dashboard*, Travolution (July 2, 2025), https://www.travolution.com/en/article/3victors-launches-priceeye-dashboard (last visited Nov. 19, 2026).

that is, the airline had stopped selling its lower fares while a competitor had not.[229] In 2018, the Wittman Dissertation had described what filed fares let airlines do: "*perfectly monitor* when their competitors make pricing changes and react accordingly, including the possibility of responding with fare wars or punishments when undercutting is detected."[230] PriceEye provides airlines a comparable capability for dynamic prices.

129. One PriceEye screen shows what this looks like in practice. In July 2025, 3Victors held a webinar to explain the PriceEye dashboard, and one screen it displayed was titled "Detailed Anomalies." The screen shows an observation date of July 31, 2025, and lists one-way economy fares for departures over the following two weeks, from August 1 through August 13, 2025. Each row names a rival airline—United ("UA"), Southwest ("WN"), or Delta ("DL")—and gives the rival's total price, the customer airline's own total price, and the difference between them. A column headed "Competitive Position" labels each row "Undercut" or "Overpriced."[231]

---

[229] *How PriceEye Works Video* at 1:27–1:38.

[230] *Wittman Dissertation* at 184.

[231] *PriceEye Dashboard Webinar* at 34:38–35:20.




**Figure 18.** PriceEye "Anomalies" and "Detailed Anomalies" screen displayed during 3Victors' July 2025 webinar, listing for each departure date the rival carrier, the rival's and customer's total prices, the difference, and a "Competitive Position" of "Undercut" or "Overpriced." *PriceEye Dashboard Webinar* at 34:41–35:20.

130. PriceEye is built around finding where an airline's fares differ from its rivals'. On the "Detailed Anomalies" screen, each listed departure is one on which the airline's fare differs from a named rival's, and each row states the gap in dollars and labels it "Undercut" or "Overpriced." 3Victors describes the dashboard as surfacing "[m]arket undercuts and overpricing."[232] In a competitive market, a fare below a rival's is not an anomaly; it is what competition looks like. PriceEye flags it as one. 3Victors states that configurable pricing alerts let airlines "react quickly."[233] In the July 2025 webinar, a 3Victors product manager said that the anomalies feature "points you towards the segments and the markets where the action's needed."[234] In September 2026, ATPCO's chief commercial officer wrote that "PriceEye's Anomaly Detection

[232] *3Victors PriceEye Page* ("How PriceEye works" section, "Insights" tab).

[233] *Id.*

[234] *PriceEye Dashboard Webinar* at 36:42–36:49.

identifies pricing anomalies and prioritizes them based on revenue impact."[235] At Elevate 2026, ATPCO's chief commercial officer told airlines that with PriceEye, "competitive shifts surface automatically."[236]

## XIII. Public sources tie each Airline Defendant to ATPCO's governance, its clean-rooms program, or 3Victors' products.

131. ATPCO and 3Victors have not published a list of the airlines that buy PriceEye or contribute to Iris, but they have said publicly that the number of airlines keeps growing. In the December 2024 announcement introducing Iris, 3Victors reported that airline participation "has increased by more than 5X this year with [a] growing pipeline of airlines engaged in connecting with our network," and that "[o]ur commitment to data timeliness, accuracy, and transparency has made PriceEye a critical tool for airlines seeking real-time competitive intelligence."[237] A year later, 3Victors' year-end review reported that "[i]n 2025, another major global network carrier went live with PriceEye and Iris with many more entering trial periods" and explained that "[a]s we scale, we're inviting more airlines to join the 3Victors community."[238]

132. ATPCO, which says it serves 457 airlines and 118 channels across 148 countries, now offers PriceEye as part of its "market analysis subscriptions" under the subheading "PriceEye for competitive market visibility," advertising how PriceEye enables a user "[u]nderstand how

---

[235] Chris Phillips, *Inside PriceEye: Turning Flight Shopping Data into Competitive Intelligence*, 3VICTORS BLOG (Sept. 9, 2026), https://www.3victors.com/blog/inside-priceeye-turning-flight-shopping-data-into-competitive-intelligence (last visited Nov. 19, 2026).

[236] *Elevate 2026 Transcript* at 5:46–5:50 (remarks of Chris Phillips, Chief Commercial Officer, ATPCO, Apr. 21, 2026).

[237] *3Victors 2024 Review*.

[238] Will Linderman, *2025 Year in Review: Powering Smarter Airline Decisions with Data, Insights, and Innovation*, 3VICTORS BLOG (Dec. 16, 2025), https://www.3victors.com/blog/2025-year-in-review-powering-smarter-airline-decisions-with-data-insights-and-innovation (last visited Nov. 19, 2026).

your airline's offers are positioned in the market with AI-powered insights into competitive pricing to help you monitor, compare, and respond with greater precision."[239]

133. ATPCO also brings competing PriceEye customers together. On October 6 and 7, 2026, ATPCO hosted a two-day "Focus Summit: PriceEye." 3Victors called it a "closed session for 3Victors customers and members of that community," and ATPCO advertised it as a "customer-only" event at which attendees could "connect directly with product experts and peers."[240] ATPCO's agenda invited attendees to "[d]iscover how organizations are putting PriceEye to work across a variety of pricing and commercial scenarios" and to "share implementation experiences" in roundtable discussions. In a session titled "Shaping the 2027 roadmap," attendees were to discuss PriceEye's "roadmap direction, future functionality, usability improvements, and long-term investments." The formal sessions closed with a "summary of key takeaways, shared priorities, and how your feedback will influence the future of PriceEye." Another session presented "Competitive-Intelligence-as-a-Service," promising capabilities that would help teams "turn competitive insights into action faster than ever before."[241] According to a November 2026 news report, 3Victors' customers include at least JetBlue, American, and Alaska.[242] On information and belief, attendees included pricing and revenue-management

---

[239] *About ATPCO*, ATPCO, https://atpco.net/about/ (last visited Nov. 19, 2026); *Market Analysis Subscriptions*, ATPCO, https://atpco.net/market-analysis-subscriptions/ (last visited Nov. 19, 2026).

[240] *Focus Summit: PriceEye—Detailed Agenda*, at 1–2 (Oct. 6–7, 2026), https://prodmedia.atpconet.atpco.net/wp-content/uploads/media/2026/08/14204024/Detailed-agenda-PriceEye-Focus-Summit-2026.pdf (last visited Nov. 23, 2026) [hereinafter *PriceEye Summit Agenda*]; *3Victors: Conference for PriceEye Customers May Bolster New Antitrust Allegations*, Capitol Forum, Vol. 14, No. 949, at 2 (Nov. 10, 2026), https://thecapitolforum.com/3victors-conference-for-priceeye-customers-may-bolster-new-antitrust-allegations/ (subscription required), PDF version available at https://library.thecapitolforum.com/docs/99zm6f6q0u703wgrh4qrawq8 (subscription required) (page citations refer to the PDF version) (last visited Nov. 23, 2026) [hereinafter *Capitol Forum Report*] (quoting 3Victors and an ATPCO event notice).

[241] *PriceEye Summit Agenda* at 1–2.

[242] *Capitol Forum Report* at 1.

personnel of several competing airlines, including one or more of the Airline Defendants. The summit thus gave competing airlines a closed forum to learn how their rivals use PriceEye and to shape, together, the tool each uses to watch the others' prices.

134. Public statements by ATPCO, 3Victors, and the airlines identify at least five of the Airline Defendants—JetBlue, Alaska, Southwest, United, and American—as 3Victors users or participants in ATPCO's shopping-data work, and they show the value those airlines place on the information exchanged. The evidence differs by carrier and by product, as alleged below. Delta's participation is alleged principally through its ownership of ATPCO and its seat on ATPCO's board.

**A. JetBlue**

135. JetBlue Technology Ventures, JetBlue's venture-capital arm, invested in 3Victors in early 2020, three years before ATPCO bought 3Victors.[243] Since at least June 2024, JetBlue's logo has appeared on 3Victors' website among the "leading travel industry organizations [that] trust 3Victors."[244]

136. When ATPCO wanted to show the industry the capabilities of its shopping data, it used JetBlue as its showcase. At Elevate 2026, ATPCO's chief commercial officer Chris Phillips introduced Nick Mirza, JetBlue's Senior Manager of Revenue Management Data Science, as "someone who's already living this experience" and thanked him for "being our guinea pig on this

---

[243] Bonny Simi, *2020 Year in Review*, SKY VC (Dec. 17, 2020), https://www.sky-vc.com/blog/2020-year-in-review (last visited Nov. 19, 2026). In 2025, SKY Leasing acquired JetBlue Ventures, which was later rebranded SKY VC. Press Release, JetBlue Airways Corp., *SKY Leasing Announces Acquisition of JetBlue Ventures* (May 5, 2025), https://ir.jetblue.com/news/news-details/2025/SKY-Leasing-Announces-Acquisition-of-JetBlue-Ventures/default.aspx (last visited Nov. 19, 2026); *3Victors Acquisition Release*.

[244] 3Victors, Homepage (archived June 22, 2024), https://web.archive.org/web/20240622170253/https://www.3victors.com/ [hereinafter *Archived 3Victors Homepage*].

data journey."[245] When asked to describe "the moment [his] team realized that the traditional competitive data wasn't enough anymore," Mr. Mirza said that competitive data is "extremely powerful" but not "helpful" if JetBlue does not "trust" it, and that JetBlue wanted "a platform and a provider that could get us the data with reliability and the right context and features."[246] Mr. Mirza explained how reliable data lets him answer the question "Is that really the fare?" when evaluating a competitor's fare. Once he concludes that something is not a "measurement error" resulting from "inaccuracies" or "gaps" "in the data," it "makes it much easier to sort of call a shot and use those data to help inform my own strategy."[247]

137. Mr. Mirza also detailed how this data can change a decision: an analyst has a "light bulb moment" when, for example, she sees something in JetBlue's "[revenue management] signals," references the "shopping data," and realizes how "it all made sense . . . that I was missing this bit of context. I was missing this signal. And here's how it helped me come up with a new decision[.]"[248]

**B. Alaska and Hawaiian**

138. On July 11, 2024, Alaska Airlines entered into an agreement with 3Victors "for its PriceEye solution to supply competitive fare content to [Alaska Airlines]," which 3Victors' announcement described PriceEye as providing airlines "with best-in-class competitive pricing data."[249] Alaska's Director of Revenue Management, Dante West, explained: "After a successful proof of concept, we found that 3Victors' PriceEye is a perfect fit for our competitive fare content needs." He added that "[t]he quality, completeness, and timely delivery of the data has been

---

[245] *Elevate 2026 Transcript.*
[246] *Id.*
[247] *Id.*
[248] *See id.*
[249] *Alaska Price Eye Release.*

impressive to see" and that Alaska was "excited to work more closely with the 3Victors team."[250] This press release also described Alaska as "a key user of ATPCO's other top products such as its pricing management tool Architect and its merchandising solution Routehappy . . . [that] saw the synergies of employing 3Victors data products."[251] The July 2024 agreement concerned PriceEye; it predated Iris. On information and belief, Alaska later contributed shopping data to Iris.

139. Two months later, in September 2024, Alaska Air Group completed its acquisition of Hawaiian Holdings.[252] Hawaiian's chief revenue officer, Brent Overbeek, had sat on the ATPCO board that approved the clean-rooms program.[253]

**C. Southwest**

140. On April 22, 2026, at ATPCO's Elevate 2026 conference in Atlanta, Andrew Hoefler, Southwest's Senior Manager of Pricing Strategy, presented a session titled "Seeing the market clearly with PriceEye" alongside ATPCO's regional director for Asia-Pacific and a 3Victors data scientist.[254] ATPCO's description of the session called PriceEye "3Victors' pricing intelligence solution built on Iris shopping data" that "helps airlines monitor market shifts and respond faster" and advertised, "Get the inside scoop on how real-time, cross-channel pricing visibility and actionable insights empower teams to optimize pricing, stay ahead of AI-driven

---

[250] *Id.*

[251] *Id.*

[252] Press Release, *Alaska Airlines Completes Acquisition of Hawaiian Airlines, Expanding Benefits and Choice for Travelers*, ALASKA AIRLINES (Sept. 18, 2024), https://news.alaskaair.com/company/alaska-airlines-completes-acquisition-of-hawaiian-airlines-expanding-benefits-and-choice-for-travelers/ (last visited Nov. 19, 2026).

[253] *April 2023 Board Release* (listing "Brent Overbeek, SVP Chief Revenue Officer, Hawaiian Airlines").

[254] *Elevate 2026 | Atlanta*, ATPCO, https://atpco.net/?p=17952 (last visited Nov. 19, 2026); *PriceEye Session Page*.

search, and make confident, data-driven decisions."[255] On information and belief, Southwest subscribed to PriceEye and contributed shopping data to Iris.

**D. United**

141. United's vice president of pricing and revenue management, Dave Bartels, sat on the ATPCO board that approved the clean-rooms program.[256] ATPCO's website announced a November 27, 2023 session at re:Invent, Amazon Web Services' annual conference, titled "Unlock Customer Value Securely with Clean Room Data Collaboration for Industries," which would feature "speakers from ATPCO, an airline retail platform, and their customer, United Airlines, on how they are experimenting together to overcome current business challenges and improve customer value."[257] At that time in 2023, ATPCO told the industry it had "already started collaborating with some major airlines in Northern America" on clean rooms.[258]

142. In April 2025, United was the only airline represented on a panel titled "AI and competitive intelligence" at ATPCO's Elevate conference in Chicago. Kevin Wang, a United senior data scientist, appeared alongside 3Victors' vice president of innovation, Rick Seaney, and Amazon Web Services' global head of travel, Massimo Morin, who had earlier appeared with ATPCO's chief executive to discuss ATPCO's clean-rooms program.[259] When asked whether artificial intelligence was "helping airlines" discover "new products they can sell," Mr. Wang

---

[255] *PriceEye Session Page*.

[256] *April 2023 Board Release* (listing "Dave Bartels, VP Pricing and Revenue Management, United Airlines").

[257] *AWS re:Invent 2023*, ATPCO, https://www.atpco.net/events/aws-reinvent-2023 (session titled "Unlock Customer Value Securely with Clean Room Data Collaboration for Industries," Nov. 27, 2023) (archived Dec. 5, 2023, at https://web.archive.org/web/20240815150305/https://www.atpco.net/events/aws-reinvent-2023).

[258] *October 2023 Session* at 24:00–24:20.

[259] *See Skift Session*.

responded that "[e]verything starts with data," and that "data providers like 3Victors also help us with competitively what is happening in the marketplace."[260]

143. Mr. Wang completed his graduate research at MIT under Dr. Peter Belobaba, with financial support from the MIT PODS Consortium, whose members included United and ATPCO. His research studied the problem this exchange addresses: Mr. Wang's 2020 thesis simulated four competing airlines and found that when one priced dynamically, most of the airline's gain was "attributable to undercutting the existing fares" of the others.[261]

**E. American**

144. American is one of ATPCO's board airlines and one of ATPCO's owners. American's vice president of revenue management, Scott Chandler, sat on the board that approved the clean-rooms program.[262] Since June 2024, American's logo has appeared on 3Victors' website among the "leading travel industry organizations [that] trust 3Victors."[263] 3Victors has also featured an American Airlines employee, Becky Gross, in its marketing. The 3Victors White Paper quotes Ms. Gross, stating, "As airline selling processes evolve with channel differentiation and continuous pricing, it becomes increasingly challenging to understand the competitive selling fare landscape. . . . Analysts are looking for more data, and more detailed data, to understand what

---

[260] ATPCOnews, *AI and Competitive Intelligence: Unlocking Opportunities While Managing Risks*, YOUTUBE (May 14, 2025), at 35:56–36:31, https://www.youtube.com/watch?v=DciPeya9sgQ (last visited Nov. 19, 2026).

[261] Kevin K. Wang, *Airline Revenue Management with Dynamic Offers: Bundling Flights and Ancillary Services* (May 2020) (S.M. thesis, Massachusetts Institute of Technology), at 3, https://dspace.mit.edu/handle/1721.1/127110 (last visited Nov. 19, 2026); Kevin K. Wang, *Airline Dynamic Offer Creation Using a Markov Chain Choice Model* (Feb. 2023) (Ph.D. dissertation, Massachusetts Institute of Technology), https://dspace.mit.edu/handle/1721.1/150196 (last visited Nov. 19, 2026).

[262] *April 2023 Board Release* (listing "Scott Chandler, VP Revenue Management, American Airlines").

[263] *Archived 3Victors Homepage*.

products are selling and associated sell-up strategies. Understanding the lowest selling fare is no longer enough."[264]

**F. Delta**

145. Delta is a co-owner of ATPCO, and ATPCO's April 2023 board announcement listed a Delta pricing and revenue management senior vice president among its board members.[265] Delta was also a member of the PODS Consortium at MIT that funded the Wittman Dissertation.[266] On information and belief, Delta participated in the approval and governance of ATPCO's shopping-data program as an owner and board airline, and Delta also participated in that program through PriceEye, Iris, or ATPCO's clean rooms.

**G. Iris and PriceEye completed the monitoring system ATPCO began building after it identified the threat from dynamic pricing.**

146. In 2017, ATPCO's research showed that airlines pricing dynamically, unable to see one another's prices, could undercut one another until fares reached marginal cost.[267] In 2018, the Wittman Dissertation explained what had held off such price wars under filed fares—"repeated multimarket interactions and the public nature of filed fare structures serve as monitoring and punishment mechanisms for airlines that defect from the cooperative equilibrium"[268]—and identified the "reduced ability of airlines to monitor the pricing actions of their competitors" as dynamic pricing's greatest risk to the status quo.[269] It predicted that "similar technology would

---

[264] *3Victors White Paper* at 8.

[265] *April 2023 Board Release* (listing "Roberto Ioriatti, SVP International Pricing and Revenue Management, Delta Air Lines"); *About ATPCO*.

[266] *Current Projects*.

[267] *2017 ATPCO Presentation* at slide 27.

[268] *Wittman Dissertation* at 202.

[269] *Id.* at 217.

emerge to monitor dynamic pricing behavior" and that "new monitoring technologies . . . would help prevent the race to the bottom as a result of dynamic pricing in the long run."[270]

147. In 2019, ATPCO published its standard for recording airlines' dynamic prices; the standard built two things. First, the record itself: copies of each exchange between an airline's pricing engine and the system requesting a price, matched against ticket sales, with unsold offers kept "for historical/analytical purposes."[271] The second was a common way to read the record: each dynamic price was recorded as a fare already described in ATPCO's data, with its booking class, brand, and rules, at a different amount, so that it could be set beside a competitor's offer recorded the same way.[272]

148. In 2023, ATPCO's chief executive described the next step: a give-to-get program in which airlines could see what their competitors were doing and their competitors could see what they were doing.[273] Iris and PriceEye put that program into practice. Iris handles collection: it pulls records directly from airlines' own systems, capturing what travelers search for and every price the airlines offer in return.[274] PriceEye handles monitoring: it sets each competitor's offer beside the airline's own fares and shows the airline when a rival has gone lower.

149. In 1992, the DOJ filed suit against ATPCO and eight airlines for using ATPCO to learn things about one another's fares that passengers could not, and the resulting decrees tied what airlines could see through ATPCO to what the public could see.[275] Dynamic pricing threatened the view of one another's prices that filed fares had given the airlines. It made possible what the

---

[270] *Id.* at 200, 218.

[271] *DPE Guide* at 12, 20, 38.

[272] *Id.* at 12, 19–21, 26.

[273] *Skift Session*, at 8:01–8:10.

[274] *See 3Victors White Paper* at 9–10; *Archived 3Victors Data Page*.

[275] *See supra* Part II.

Wittman Dissertation called "secret price cuts": discounts offered one traveler at a time, which competitors could not see and therefore could not quickly match.[276] ATPCO's 2017 research showed that those cuts carried the risk of a price war ending at marginal cost.[277] Through Iris and PriceEye, ATPCO now supplies contributing airlines with their competitors' nonpublic offers, translates them into ATPCO's terms, and flags when a rival has gone lower. Plaintiff alleges that, in doing so, Defendants have rebuilt by private arrangement a degree of cross-airline price visibility that exceeds what the 1994 Decree permitted ATPCO to provide.

## XIV. Domestic air travel is the relevant market.

150. Courts assess the competitive effects of concerted action by defining a relevant market—the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market has two dimensions: the "product market" and the "geographic market." Here, the relevant market is scheduled domestic air passenger transportation in the United States (the "Relevant Market").

### A. The relevant product market is scheduled domestic air passenger transportation.

151. The relevant product market is scheduled air passenger transportation between points within the United States ("Domestic Air Travel"). For most domestic trips, ground transportation is not a reasonable alternative to air travel. Long-distance travel that takes only hours by plane can take a day or more by car, bus, or train. A 1,000-mile trip, for example, takes roughly 2 to 3 hours by air but about 15 hours by car at highway speeds; a 2,000-mile trip takes roughly 4 to 5 hours by air but nearly 30 hours by car.

---

[276] *Wittman Dissertation* at 199.

[277] *2017 ATPCO Presentation* at slide 27.

152. In its 2021 complaint in *United States v. American Airlines Group Inc.*, DOJ alleged that scheduled air passenger service is not reasonably interchangeable with alternative modes of transportation. According to DOJ, "[d]ue to time savings and convenience afforded by scheduled air passenger service, not enough passengers would substitute other modes of transportation (car, bus, or train) to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of scheduled air passenger service."[278] Defendant American agreed, and the court found that "the parties agree, and the Court finds, that the relevant product market is 'scheduled air passenger service.'"[279]

153. Economic research commissioned by IATA estimates that, for travel inside North America, the price elasticity of demand for air travel measured at the national level is approximately −0.8 for long-haul trips and −0.9 for short-haul trips.[280] IATA elucidates that national-level figures describe how travelers respond to a price change on all routes from a particular country, such as an increase in national departure tax, rather than a change on a single route.[281] A price elasticity of demand smaller than one in absolute value means that demand is inelastic, i.e., when the price of all air travel rises, the number of passengers falls by proportionally less than the price because travelers have too few alternatives.

---

278 Complaint, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558, ECF No. 1 (D. Mass. Sept. 21, 2021), ¶ 39.

279 *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 117 (D. Mass. 2023), *aff'd*, 121 F.4th 209 (1st Cir. 2024).

280 Mark Smyth & Brian Pearce, *Air Travel Demand*, IATA Economics Briefing No. 9 (Apr. 2008), at 8 tbl. 1, https://www.iata.org/en/iata-repository/publications/economic-reports/air-travel-demand/ (last visited Nov. 18, 2026); *see also* InterVISTAS Consulting Inc., *Estimating Air Travel Demand Elasticities*, at vi–v (Dec. 28, 2007), https://www.iata.org/en/iata-repository/publications/economic-reports/estimating-air-travel-demand-elasticities---by-intervistas (last visited Nov. 18, 2026) (reporting −0.80 for long-haul and −0.88 for short-haul).

281 Smyth & Pearce, at 5, 26–27.

154. Scheduled air passenger transportation is treated as a distinct line of business by the federal government and the airlines. An airline "may provide air transportation only if the air carrier holds a certificate" from DOT, and DOT only may issue one after finding that the airline is "fit, willing, and able to provide the transportation."[282] DOT's Bureau of Transportation Statistics ("BTS") collects and publishes airline activity and market-share data for the airline industry.[283]

**B. The relevant geographic market is the United States.**

155. The major U.S. airlines treat domestic air travel and international air travel as separate fields of competition. For example, United's annual report discusses domestic and international competition within separate subheadings under its "Industry Conditions" section. There, it states that "[t]he domestic airline industry is highly competitive and dynamic" and that "[d]omestic pricing decisions are impacted by intense competitive pressure exerted on the Company by other U.S. airlines." Conversely, in discussing international competition, United reports that it "competes not only with U.S. airlines, but also with foreign carriers."[284]

156. Within the United States, any carrier may serve any part of the country, and these airlines move aircrafts and crews where the demand is. United reports "any U.S. carrier deemed fit by the U.S. Department of Transportation" is "largely free to operate scheduled passenger service between any two points within the United States."[285]

---

[282] 49 U.S.C. §§ 41101(a)(1), 41102(b)(1).

[283] Bureau of Transp. Stat., U.S. Dep't of Transp., *Airline Domestic Market Share September 2025 – August 2026*, https://www.transtats.bts.gov/ (last visited Nov. 18, 2026) [hereinafter *BTS Domestic Market Share*]; Bureau of Transp. Stat., U.S. Dep't of Transp., *Carrier Snapshots*, https://www.transtats.bts.gov/Carriers.asp (last visited Nov. 18, 2026) [hereinafter *BTS Carrier Snapshots*].

[284] United Airlines, Inc., Annual Report (Form 10-K) (Feb. 12, 2026), https://www.sec.gov/Archives/edgar/data/319687/000010051726000023/ual-20251231.htm (last visited Nov. 18, 2026).

[285] *Id.*

157. This ability to shift capacity is called "supply-side substitution": a seller that does not yet serve a group of buyers can begin serving them quickly with equipment it already possesses. In September 2023, JetBlue Airways and Spirit Airlines explained to a federal court that "airline networks are fluid."[286] In December 2023, these airlines told the same court that it had "heard witness after witness testify that the airline industry is highly dynamic" and that "supply-side substitution occurs routinely as airlines redeploy planes across their networks."[287]

158. JetBlue and Spirit also characterized domestic airline competition as national. In September 2023, they told the federal court that "airlines operating national networks are in the same relevant market because of their substitutability of supply" and that "[t]he evidence presented at trial will show a high degree of supply substitution in the airline industry."[288] Three months later, they described that "[a]irlines compete nationally in numerous ways" and that "airlines choose their business model and on-board product offerings at the national level."[289] They also explained to the court that "the Government's experts expressly concede that airlines compete at the national level," and the government's economic expert "concedes that a national market would pass the hypothetical monopolist test."[290]

## XV. The Airline Defendants collectively hold market power in domestic air travel.

159. BTS reports each airline's market share of domestic revenue passenger miles. For the twelve months from September 2025 through August 2026, BTS reports these shares: Delta, 18.0 percent; American, 17.8 percent; United, 17.3 percent; Southwest, 17.1 percent; Alaska, 7.3

---

[286] Defs.' Mem. in Opp'n to Pls.' Mot. in Limine Regarding Purported Out-of-Market Benefits, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 196 (D. Mass. Sept. 20, 2023), at 10.

[287] Defs.' Proposed Conclusions of Law, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 446 (D. Mass. Dec. 13, 2023), ¶¶ 17, 24, at 6, 9.

[288] *JetBlue Defs.' MIL Opp'n*, at 10.

[289] *JetBlue Defs.' Proposed Conclusions* ¶ 28, at 10.

[290] *Id.* ¶¶ 33, 38, at 12, 14.

percent; and JetBlue, 4.7 percent. The four largest airlines carried 70.2 percent of domestic revenue passenger miles, and the six Airline Defendants together carried 82.2 percent.[291]

160. The four largest airlines are nearly equal in market share, and no other airline approaches them. Frontier Airlines, the largest airline outside the six Airline Defendants, carried 3.9 percent of domestic revenue passenger miles across the same period.[292] DOJ has alleged that "[c]oordination becomes easier as the number of major airlines dwindles[.]"[293]

161. In June 2026, the U.S. Government Accountability Office ("GAO") reported that "[f]rom 2008 through 2013, eight airlines consolidated to become four airlines. As a result, there are fewer major U.S. airlines today than at any time since deregulation in 1978."[294] In September 2023, a federal court reviewing the summary-judgment record in a class action over the airlines' domestic flight capacity quoted statements from United executives made to investors about the four largest carriers' market share. According to the court, on June 4, 2014, United's then-CEO said at an investor conference that in 2007 "nobody had more than 16% share of the US market," that the four largest carriers together "had about a 55% market share," and that "[t]oday those four carriers, post-merger, have over 80% market share." This court also quoted a United executive vice president who, on June 4, 2015, said at an investor conference that "the top four largest carriers have over 80% of the domestic market share and that's created a discipline in this business that didn't exist previously."[295]

---

[291] *BTS Domestic Market Share*; *BTS Carrier Snapshots*.

[292] *BTS Domestic Market Share*.

[293] *2013 Complaint* ¶ 46.

[294] U.S. Gov't Accountability Off., GAO-26-107740, *Airline Competition: Indicators Suggest Increased Competition in the Past Two Decades, but Lower-Cost Airlines Face Challenges*, at 1 (June 25, 2026), https://www.gao.gov/products/gao-26-107740 (last visited Nov. 18, 2026) [hereinafter *GAO Airline Competition Report*].

[295] *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 199–200 (D.D.C. 2023).

162. The lower-cost airlines that once helped keep the largest carriers in check are shrinking. Spirit Airlines filed for bankruptcy twice in 2025 and stopped flying aircraft on May 2, 2026, and Allegiant acquired Sun Country in 2026.[296] GAO reported that "while lower-cost airlines' market share grew significantly from 2007 through 2022, that growth has stalled in recent years."[297]

163. The largest airlines' market power is bolstered by loyalty programs and co-branded credit cards. Delta reported that its 2025 "remuneration from American Express totaled $8.2 billion, which we expect to grow to $10 billion over the next few years."[298] According to GAO, stakeholders and DOT officials have explained that the large airlines' credit card rewards programs provide them with "a large revenue stream to better weather industry volatility and exercise pricing flexibility."[299]

## XVI. The exchange harms price competition in domestic air travel.

164. ATPCO's products allow airlines to view each other's current, carrier-by-carrier prices, including dynamic prices that travelers cannot see together and that do not appear in public fare data. DOJ, economists, and research commissioned by ATPCO have each tied that kind of information to reduced competition, including fewer price cuts and fewer price wars.

---

[296] Hannah Senecal, *"Chapter 22" Turbulence: Spirit Airlines Refiles for Bankruptcy Just Months After Exiting Chapter 11*, UNIV. OF MIAMI BUS. LAW REV. (Sept. 22, 2025), https://business-law-review.law.miami.edu/chapter-22-turbulence-spirit-airlines-refiles-for-bankruptcy-just-months-after-exiting-chapter-11/ (last visited Nov. 18, 2026); Joel Rose, *Spirit Airlines Ceases Operations After Escalating Financial Struggles*, NPR (May 2, 2026), https://www.npr.org/2026/05/02/nx-s1-5807933/spirit-airlines-ceases-operations-folds (last visited Nov. 18, 2026); Allegiant Newsroom, *Allegiant Completes Acquisition of Sun Country Airlines, Creating the Leading Leisure-Focused U.S. Airline*, ALLEGIANT (May 13, 2026), https://newsroom.allegiantair.com/press-releases/press-release-details/2026/Allegiant-Completes-Acquisition-of-Sun-Country-Airlines-Creating-the-Leading-Leisure-Focused-U-S--Airline/default.aspx (last visited Nov. 18, 2026).

[297] *GAO Airline Competition Report*, at 54–55.

[298] Delta Air Lines, Inc., Annual Report (Form 10-K) (Feb. 11, 2026), at 4, https://www.sec.gov/Archives/edgar/data/27904/000002790426000013/dal-20251231.htm (last visited Nov. 18, 2026).

[299] *GAO Airline Competition Report*, at 55–56.

### A. The exchanged information has the features DOJ associates with harm to competition.

165. DOJ has identified several factors that indicate exchanged information is likely to harm competition: sensitivity, level of detail, lack of public availability, and contemporariness.[300] In DOJ's words, "[e]xchanges of price, output, or cost information can 'stabilize prices' by encouraging or enabling competitors to match prices or to use each other as a benchmark in pricing."[301] DOJ has also stated that "exchanges of recent or future information carry far greater potential for anticompetitive effects than historical data."[302] The information exchanged through Iris and PriceEye has these features. It consists of prices, and DOJ has stated that "the more sensitive the information, the more it can be used to restrain competition."[303] It is not public: most of what Iris receives, including the searches themselves and offers travelers never saw, appears nowhere else. And as alleged below, it is current, forward-looking, and broken down airline by airline and departure date by departure date.

166. Through ATPCO, participating airlines receive information about their rivals' prices that no airline could obtain through its own observation of the market. Dynamic prices offered in response to travelers' searches do not appear in filed fares, and an airline watching on its own sees only the prices returned to the searches it runs.[304] Through ATPCO, each participating airline receives its rivals' prices on a carrier-by-carrier basis because those rivals contribute their shopping data to Iris on the condition that they receive shopping data in return. PriceEye shows each airline its competitors' individual fares, each identified by the airline that offered it, and adds

---

[300] Statement of Interest of the United States, *In re Pork Antitrust Litig.*, No. 0:18-cv-01776, ECF No. 2616 (D. Minn. Oct. 1, 2024), at 12–17 [hereinafter *Pork Statement of Interest*].

[301] *Id.* at 13.

[302] *Id.* at 17.

[303] *Id.* at 13.

[304] *See supra* Parts III, VII, XI.

to each offer the fare basis code, booking class, and brand that identify which fare the rival is selling.[305]

167. The information exchanged through ATPCO is current and forward-looking:

(a) *Current.* Iris gathers shopping data "throughout the day, enabling multiple daily feeds" and "real-time market intelligence."[306] 3Victors promises contributing airlines insight "hour by hour, not day by day."[307] When ATPCO's chief executive introduced the clean-rooms program in 2023, he said that a once-a-day feed of competitors' fares was "not going to work."[308] In 1992, according to DOJ, the airlines processed ATPCO's fare data into "detailed daily reports."[309]

(b) *Forward-looking.* According to 3Victors, the PriceEye dashboard surfaces "[h]istorical trends and future outlooks,"[310] and, until at least October 4, 2026, 3Victors invited airlines to "[v]iew future pricing and availability to identify competitive gaps, optimize positioning, and act before competitors do."[311] PriceEye's "Price Outlook" screens displays competitors' prices for future departure dates.[312] PriceEye thus shows each airline what its rivals are offering for flights it is still selling.

**B. PriceEye's reports make fare cuts less attractive and mistaken price wars less likely.**

168. ATPCO itself identified better information about rivals' prices as the remedy for the price war it warned could result from dynamic pricing. Its 2017 presentation depicted two airlines repeatedly undercutting each other one dollar at a time, from $350 down to $99, just below

[305] *See 3Victors Data Page* ("How PriceEye works" diagram); *PriceEye Dashboard Webinar* at 7:57–8:12, 34:38–35:20.

[306] *3Victors White Paper* at 10.

[307] *3Victors Data Page* ("Why contribute?" tab).

[308] *Skift Session* at 6:47–7:40.

[309] *1994 Federal Register Notice*.

[310] *3Victors PriceEye Page* ("How PriceEye works" section, "Insights" tab; "Analytics built for action" section).

[311] *Archived PriceEye Page* ("The PriceEye dashboard" section, "Analytics built for action" section).

[312] *PriceEye Dashboard Webinar* at 27:29–27:57.

the $100 fare the slide labeled marginal cost. The line directly beneath the illustration read: "Could [be] mitigated by the availability of improved pricing data."[313] PriceEye supplies that information.

169. The information PriceEye provides about each "anomaly" makes fare cuts less likely and fare increases more likely. When an airline's fare is below a rival's, PriceEye shows how much room the airline has to raise prices without surpassing the rival's fare. When a competitor undercuts an airline, PriceEye shows how far the rival must cut to match, on which departure dates, and against which rival. Every airline that uses PriceEye receives the same kind of report. An airline considering a fare cut therefore knows that its rivals will see the cut, and its size, within hours. The cut will draw travelers only until those rivals match it. After that, the airline that cut first is left with a lower fare and few added travelers to show for it.

170. According to DOJ, ATPCO's fare data had this effect before the 1994 Decree, and ATPCO's own research anticipated the same effect for dynamic prices. DOJ alleged in 1992 that airlines used ATPCO's fare-filing mechanisms to respond to one another's discounts in ways their rivals understood, and that ATPCO "in this way . . . facilitates the successful elimination of many discounts and discourages competitive pricing in the first place."[314] DOJ further alleged that ATPCO's devices facilitated "coordination that would not occur simply by virtue of the structure of the airline industry," and that "[w]ith these devices, the airlines can coordinate and achieve fare levels above those that otherwise would have prevailed."[315] The 1994 Decree subsequently limited what airlines could learn about one another's fares through ATPCO.[316] In 2017, when dynamic pricing was still largely prospective, ATPCO identified better pricing data as the remedy for the

---

[313] *2017 ATPCO Presentation* at slide 27.

[314] *1992 CIS* at 19.

[315] *Id.* at 14, 16.

[316] *See 1994 Decree* § IV.

price war dynamic pricing could cause. The next year, the Wittman Dissertation predicted that technology to monitor airlines' dynamic prices would emerge and added: "Even if this monitoring is not conducted in real-time, it may still serve as a deterrent to short-term undercutting."[317]

171. Seeing rivals' actual prices also prevents price wars that start by mistake. An airline that loses bookings without seeing its rivals' prices does not know whether the fewer bookings resulted from a rival's fare cut or weaker demand, and it may cut its own fares in response to a cut that never happened. DOJ described this risk in 1992: "misconstruing a competitor's intentions could precipitate additional fare cutting."[318] ATPCO's 2017 research recognized the same risk for dynamic pricing.[319] An airline that sees each rival's prices, carrier by carrier, can determine a rival's cut from a change in demand.

172. Step by step, the exchange works as follows:

(a) each participating airline's dynamic prices reach its rivals within hours, identified by carrier;

(b) PriceEye flags fares that fall below a rival's and directs pricing teams to them;

(c) a cut that rivals can observe and match within hours wins few travelers, so an airline has less incentive to make one;

(d) airlines that can see one another's actual prices are less likely to respond to cuts that never happened, so fewer price wars start; and

(e) fewer price cuts and fewer price wars results in higher fares.

## C. The structure of Domestic Air Travel magnifies the exchange's effects.

173. Three features of Domestic Air Travel magnify the exchange's effects. A few airlines carry most travelers. New airlines cannot quickly enter or expand to undercut higher fares.

---

[317] *Wittman Dissertation* at 200.

[318] *1992 CIS* at 16.

[319] *See 2017 ATPCO Presentation* at slide 27*; Wittman Dissertation* at 197–98.

Meanwhile, the major airlines meet one another across much of the country, every day, year after year.

174. ***High concentration.*** A few airlines carry most domestic travelers, and nearly all of them partake in the exchange. Six airlines carry about four of every five domestic air travelers.[320] In 2023, DOJ alleged that American, United, Delta, and Southwest "together control approximately 80% of flights nationwide."[321]

175. ***Barriers to entry and expansion.*** Higher fares would ordinarily incentivize new airlines to enter the market and smaller airlines to add flights, and that new service would push fares back down. That response depends on how quickly and cheaply new and smaller airlines can add service. In Domestic Air Travel, regulatory requirements, limited airport access, and scale advantage slow down that response.

176. A new airline must obtain a DOT certificate before it carries its first paying passenger, which requires a DOT finding that it is fit to provide service.[322] It must also complete the Federal Aviation Administration's certification process.

177. Access to the nation's busiest airports is limited. In 2013, DOJ stated that four of the busiest United States airports operating under FAA restrictions on takeoffs and landings, known as slots, and that the lack of available slots was "a substantial barrier to entry at those airports, especially for low-cost carriers." DOJ further stated that slots at those airports "are concentrated in the hands of large legacy airlines that have little incentive to sell or lease slots to those carriers most likely to compete aggressively against them," and that at several large airports

---

[320] *BTS Domestic Market Share*.

[321] Complaint, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511, ECF No. 1 (D. Mass. Mar. 7, 2023), ¶ 11 [hereinafter *2023 JetBlue Complaint*].

[322] *See* 49 U.S.C. §§ 41101(a)(1), 41102(b)(1).

"a significant portion of the available gates are leased to established airlines under long-term exclusive-use leases."[323]

178. New and smaller airlines must also overcome the advantages that larger airlines derive from their size. According to DOJ, an airline seeking to enter or expand "must overcome the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; a less well-known brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier."[324] JetBlue and Spirit told a federal court that "the value of a loyalty program is driven to a large degree by the airline's network."[325]

179. ***Repeated interactions.*** The major airlines compete against the same rivals every day, across much of their networks, year after year. The Wittman Dissertation reported that "[a]irlines interact with their competitors *repeatedly and indefinitely* in a wide variety of markets."[326] A seller that meets a rival only once can cut its price and keep the gain, without concern the rival will respond later. By contrast, an airline that cuts a fare today faces rivals that can answer tomorrow, and wherever else their networks overlap. The more often airlines compete, the more costly a visible far cut becomes, and the more it matters whether rivals can detect that cut within hours, as the exchange allows.

180. In 2023, DOJ alleged that "[m]any airlines also overlap on multiple routes, which provides opportunities for them to use fare increases or discounts on one route to influence or discipline a rival's behaviors on another route, all in coordinated pursuit of higher fares."[327] DOJ

---

[323] Competitive Impact Statement, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (CKK), ECF No. 148 (D.D.C. Nov. 12, 2013), at 7 [hereinafter *2013 CIS*].

[324] *Id.*

[325] Defs.' Proposed Findings of Fact, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 444 (D. Mass. Dec. 13, 2023), ¶ 80.

[326] *Wittman Dissertation* at 184 (emphasis in original).

[327] *2023 JetBlue Complaint* ¶ 46.

further alleged that JetBlue and the four largest airlines use “cross-market initiatives” “to deter aggressive discounting and prevent fare wars.” Under these initiatives, if an airline discounts on one route, “an affected competitor often retaliates by offering discounts on another route where the first airline prefers a higher fare,” and these initiatives “often cause an airline to withdraw fare discounts.”[328] DOJ provided an example: in March 2019, American filed a low fare on one route, JetBlue answered with low fares on several other routes American served, and after American canceled its low fare, JetBlue withdrew its own.[329] DOJ’s 2013 complaint similarly alleged that the legacy airlines used cross-market initiatives.[330]

**D. Fares rose sharply after the exchange was fully in place.**

181. By the start of 2026, every part of the exchange was in place. 3Victors introduced Iris in December 2024, and PriceEye has delivered competitors’ prices on a dashboard since July 2025.[331] By 2026, participating airlines could see one another’s dynamic prices, carrier by carrier and departure date by departure date, within hours. PriceEye flagged for them each instance in which a rival had “[u]ndercut” them.[332] An airline considering a fare cut knew that its rivals would quickly see it. 2026 was the first full year in which the exchange operated with all these features.

---

328 *Id.* ¶¶ 50–51.

329 *Id.* ¶ 51.

330 *2013 Complaint* ¶ 43 (“The legacy airlines also use what they call ‘cross-market initiatives,’ or ‘CMIs,’ to deter aggressive discounting and prevent fare wars. A CMI occurs where two or more airlines compete against each other on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market—a CMI—where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts. For example, in the fall of 2009, US Airways lowered fares and relaxed restrictions on flights out of Detroit (a Delta stronghold) to Philadelphia. Delta responded by offering lower fares and relaxed restrictions from Boston to Washington (a US Airways stronghold). US Airways’ team lead for pricing observed Delta’s move and concluded ‘[w]e have more to lose in BOSWAS . . . I think we need to bail on the [Detroit-Philadelphia] changes.’”).

331 *3Victors 2024 Review*; *PriceEye Dashboard Webinar* at 7:57–8:12.

332 *PriceEye Dashboard Webinar* at 34:38–35:20.

182. With the exchange in place, fares rose sharply as airlines withdrew their lowest fares. Delta's chief executive described a "20% price increase, which largely we've taken this year," and "the limited amount of resistance that we see."[333] United's chief executive said he had been "pleasantly surprised at the industry's ability this year to raise yields and pass through much of the increase in fuel prices," and an analyst told him: "you're all demonstrating so much more pricing power than I think any of us thought a few quarters ago."[334]

183. An airline that expects a seat to fly empty is better off selling it at any fare above the marginal cost of carrying one additional passenger, so in a competitive market the lowest fares can fall close to that cost.[335] In 2017, ATPCO warned that dynamic pricing could trigger that kind of undercutting and found that better information about competitor's prices could mitigate it.[336] In 2026, airline executives described those lowest fares as gone.

184. In July 2026, United's chief executive said that "[t]here's no more $9 fares from Houston to Central America or $4 tickets from Los Angeles to Cabo," and "I don't think it's ever going to exist again."[337] Delta's chief executive described the same change that month. An analyst noted investors' concern, in light of "the industry's ability to hold on to fare increases," that low-fare carriers might "come in and undermine the structure as -- maybe as energy prices come off."

---

[333] Delta Air Lines, Inc., Q3 2026 Earnings Call Transcript (Oct. 9, 2026), at 12, https://s2.q4cdn.com/181345880/files/content_files/DAL-Edits-Final-Delta-Air-Lines-Inc-DAL-US-Q3-2026-Earnings-Call-9-October-2026-10_00-AM-ET.pdf (last visited Nov. 19, 2026) [hereinafter *Delta Q3 2026 Call*] (remarks of Ed Bastian, Chief Executive Officer).

[334] *UAL Q3 2026 Earnings Call Transcript*, Platform Aeronaut Transcripts, https://transcripts.platformaeronaut.com/transcripts/UAL-3Q26-transcript (last visited Nov. 19, 2026).

[335] *See Wittman Dissertation* at 183; *2017 ATPCO Presentation* at slide 27.

[336] *2017 ATPCO Presentation* at slides 12, 27, 33.

[337] *UAL Q2 2026 Earnings Call Transcript*, Platform Aeronaut Transcripts (July 10, 2026), https://transcripts.platformaeronaut.com/transcripts/UAL-2Q26-transcript (last visited Nov. 19, 2026). United's chief commercial officer later corrected the second figure ("I think $14 is the accurate number") and said that such "incredibly low fares" "are no longer out there." *Id.*

Delta's chief executive answered that the last time fuel prices had been this volatile, nine or ten years earlier, low-cost carriers "looked [at] fuel as a competitive advantage because they had lower cost in other areas." He continued: "Some of them such as Southwest had fuel hedges in place, which they used to try to take market share. None of that exists any longer." Later in that same response, he said: "there's nothing to be gained by trying to grow in that environment. The opportunity has to be in finding ways to secure higher revenues, not higher market share."[338]

185. The Airline Defendants chose to carry fewer passengers rather than offer lower fares. United reported that its leisure load factor—the share of seats filled—fell 1.3 points in the third quarter, "a trade we would make every day."[339] American's chief commercial officer explained that the airline "prioritized yield over load factor, proactively securing meaningfully higher yields in exchange for slightly lower loads," even though "American traditionally has been a leader in load factor."[340] American's chief executive called it "a trade-off we're going to make every day of the week," explaining: "But when you're taking a look at revenue performance that we've seen in double-digit unit revenue increases, that's a trade-off we're going to make every day of the week."[341] Alaska expressed the same preference. After an analyst noted a two-point

---

[338] Delta Air Lines, Inc., Q2 2026 Earnings Call Corrected Transcript (July 10, 2026), at 9, https://s2.q4cdn.com/181345880/files/doc_events/2026/July/CORRECTED-TRANSCRIPT_-Delta-Air-Lines-Inc-DAL-US-Q2-2026-Earnings-Call-10-July-2026-10_00-AM-ET.pdf (last visited Nov. 19, 2026) [hereinafter *Delta Q2 2026 Call*] (question of Michael Linenberg, Deutsche Bank Securities Inc.; remarks of Ed Bastian, Chief Executive Officer).

[339] United Airlines Holdings, Inc., Q3 2026 Earnings Call Transcript (Oct. 21, 2026), StockAnalysis, https://stockanalysis.com/stocks/ual/transcripts/709633-q3-2026/ (last visited Nov. 19, 2026) [hereinafter *United Q3 2026 Call*].

[340] American Airlines Grp. Inc., Q3 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/aal/transcripts/713928-q3-2026/ (last visited Nov. 19, 2026) [hereinafter *American Q3 2026 Call*].

[341] American Airlines Grp. Inc., Morgan Stanley's 14th Annual Laguna Conference (transcript), StockAnalysis, https://stockanalysis.com/stocks/aal/transcripts/753167-morgan-stanley-s-14th-annual-laguna-conference/ (last visited Nov. 19, 2026) [hereinafter *American Laguna Conference Transcript*].

decline in Alaska's third-quarter load factor, Alaska's chief commercial officer said that "there will be continued load pressure," explaining: "the load trade-off from the increase in yields we feel really good about."[342]

186. The Airline Defendants kept fares elevated even as airlines lost money. United's chief executive said in October 2026 that "six to ten U.S. airlines are going to lose money this year."[343] American reported a third-quarter adjusted loss for 2026 and projected an adjusted loss for the year, and Alaska similarly reported a third-quarter GAAP net loss and projected an adjusted loss for the year.[344] American nonetheless gave up passengers to preserve fares, and Alaska anticipated continued load pressure. Ordinarily, an airline losing money and flying empty seats has an incentive to cut fares to fill them. However, that cut makes little sense if rivals will see and match it within hours, leaving the airline that cut first with a lower fare without gaining many additional travelers.

187. Jet fuel prices climbed sharply in 2026, but airline executives said the industry's response was faster than in recent cycles and described it as more than a response to fuel. Delta's chief executive said that "structural change has accelerated, enabling the industry to recapture this year's fuel cost inflation at the fastest pace of any recent cycle."[345] American's chief executive

---

[342] Alaska Air Grp., Inc., Q3 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/alk/transcripts/712741-q3-2026/ (last visited Nov. 19, 2026).

[343] *United Q3 2026 Call*.

[344] American Airlines Grp. Inc., Q3 2026 Earnings Conference Call (Oct. 22, 2026), https://americanairlines.gcs-web.com/events/event-details/q3-2026-american-airlines-group-inc-earnings-conference-call (last visited Nov. 19, 2026) (remarks of Devon May, Chief Financial Officer); Press Release, American Airlines Grp. Inc., American Sets New Revenue Records amid Historic Fuel Cost Pressure (Oct. 22, 2026), at 1, 5, https://s202.q4cdn.com/200B986123435/files/doc_news/American-sets-new-revenue-records-amid-historic-fuel-cost-pressure-CORP-FI-10-2026.pdf (last visited Nov. 19, 2026); Press Release, Alaska Air Grp., Inc., Alaska Air Group Reports Third Quarter 2026 Results (Oct. 20, 2026), at 1–2, https://news.alaskaair.com/wp-content/uploads/2026/10/Q3-2026-ALK-Earnings-Release.pdf (last visited No. 19, 2026).

[345] *Delta Q2 2026 Call* at 4.

described the 2026 fuel increase as the occasion for higher fares rather than their cause: "I think the fuel price increase that we've experienced has just been a catalyst to allow us to realize that there is value."[346]

188. Fares did not fall when fuel prices did. Jet fuel prices fell from May to June 2026. In July, United's chief executive said that "there were no fare decreases when fuel went down," and Southwest's chief executive said that "industry recapture has been swift and pricing has remained sticky."[347]

189. A fare increase that passes through a cost should recede when the cost does. Executives of four Airline Defendants, however, told investors they expect to keep the increases. Delta's chief executive said: "Fuel prices will recede. . . . And the test for us at Delta, and I think for the industry is to ensure that we sustain the revenue that we have created. And I don't see any reason why we shouldn't."[348] He further said that "current revenue momentum should remain sustainable even if fuel prices moderate,"[349] and that the "new baseline that we've established . . . we intend to hold that."[350] United's chief executive said: "I certainly think pricing is going to stay. . . ."[351] American's chief executive said that "the vast majority of that is something that we're

---

[346] *American Q3 2026 Call.*

[347] Press Release, Bureau of Transp. Stat., *U.S. Airlines' June 2026 Aviation Fuel Cost Down 10.0%, Consumption Up 2.5%, and Fuel Cost per Gallon Down 12.2% from May 2026* (Aug. 6, 2026), https://www.bts.gov/newsroom/us-airlines-june-2026-aviation-fuel-cost-down-100-consumption-25-and-fuel-cost-gallon-down; United Airlines Holdings, Inc., Q2 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/ual/transcripts/652978-q2-2026/ (last visited Nov. 19, 2026); Southwest Airlines Co., Q2 2026 Earnings Call Transcript (July 23, 2026), https://d1io3yog0oux5.cloudfront.net/_09b512b2bf0ccf634bfc8c0e1a6aa39a/200bsouthwestairlines/db/938/9908/webcast_transcript/LUV+2Q26+Earnings+Call+Transcript.pdf (last visited Nov. 19, 2026) (remarks of Robert E. Jordan, President & Chief Executive Officer).

[348] *Delta Q3 2026 Call* at 12.

[349] *Delta Q2 2026 Call* at 4.

[350] *Delta Q3 2026 Call* at 22.

[351] *United Q3 2026 Call.*

going to be able to retain."[352] Alaska told investors that a portion of its expected earnings growth in 2027 would result from "the annualization of this fare environment."[353]

190. In 2018, a dissertation drawing on ATPCO-supported research identified information as the remedy for the price wars that dynamic pricing threatened: "By giving airlines additional information about the pricing actions of their competitors, airlines could maintain pricing discipline without costly price wars."[354] In 2026, after ATPCO introduced Iris and PriceEye, the Airline Defendants' fares rose together, did not decline alongside fuel prices, and are expected to remain up.

**ANTITRUST INJURY**

191. The conduct alleged in this Complaint has had the following effects, among others:

(a) price competition among the Airline Defendants and their co-conspirators in Domestic Air Travel has been restrained and suppressed;

(b) prices for Domestic Air Travel have been raised, maintained, or stabilized at artificially high, noncompetitive levels;

(c) purchasers of Domestic Air Travel have been deprived of the benefits of free and open competition; and

(d) purchasers of Domestic Air Travel have paid artificially inflated fares.

192. Plaintiff and the members of the Classes bought tickets for Domestic Air Travel directly from airlines that participated in the exchange: members of the American Purchaser Class bought from American, and members of the JetBlue Purchaser Class bought from JetBlue. They

---

352 *American Laguna Conference Transcript*.

353 Alaska Air Grp., Inc., *Investor Day Transcript*, (Sept. 29, 2026), at 19, https://news.alaskaair.com/wp-content/uploads/2026/10/AAG-Investor-Day-Transcript.pdf (last visited Nov. 19, 2026) (remarks of Shane Tackett, President and Chief Financial Officer of Alaska Airlines).

354 *Wittman Dissertation*, at 218.

are direct purchasers. Each paid more for those tickets than the member would have paid absent the conspiracy, and that overcharge is an injury to the member's property.

193. The injury flows from what makes Defendants' conduct unlawful. The exchange works by giving competing airlines a current view of one another's nonpublic prices, which reduces the payoff from cutting fares and makes price wars less likely. Higher fares paid by the airlines' direct customers are the harm that reduced price competition produces. That is the type of injury the antitrust laws were designed to prevent.

194. The exchange continues to operate. Unless enjoined, Defendants' conduct will continue to cause Plaintiff and the members of the Classes to pay inflated fares for Domestic Air Travel.

## INTERSTATE TRADE AND COMMERCE

195. Defendants' conduct was within the flow of, was intended to affect, and did have a substantial effect on interstate commerce of the United States, including in this District. The Airline Defendants sell air transportation between airports in different States, and ATPCO and 3Victors collect, process, and distribute airlines' fare and shopping data across state lines.

## CLASS ACTION ALLEGATIONS

196. Plaintiff brings this action on behalf of themselves and as a class action under Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following classes (together, the "Classes"):

> **American Purchaser Class:** All persons who, during the period from November 25, 2022 through the present (the "American Class Period"), purchased one or more tickets from American for U.S. domestic air passenger transportation.
>
> **JetBlue Purchaser Class:** All persons who, during the period from November 25, 2022 through the present (the "JetBlue Class Period"), purchased one or more tickets from JetBlue for U.S. domestic air passenger transportation.

197. The American Class Period and the JetBlue Class Period are together the "Class Periods."

198. Excluded from each Class are Defendants and their subsidiaries and affiliates; all persons who timely elect to be excluded; governmental entities; the judge assigned to this case and the judge's immediate family; and Plaintiff's counsel. Plaintiff reserves the right to revise the class definitions based on information learned in discovery.

199. This action may be maintained as a class action under Rule 23. Plaintiff can prove the elements of the claims on a class wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims.

200. ***Numerosity.*** Each Class is so numerous and geographically dispersed that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Plaintiff estimates that the Classes include millions of individual purchasers. The precise number of class members is unknown to Plaintiff but can be determined from Defendants' records. Class members may be notified of this action by recognized, Court-approved methods, which may include U.S. mail, email, internet postings, and published notice.

201. ***Commonality and predominance.*** The claims of the members of each Class involve common questions of law and fact that predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(a)(2), (b)(3). Those common questions include:

(a) whether Defendants engaged in the conduct alleged in this Complaint;

(b) whether setting up and maintaining the information exchange alleged in this Complaint is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c) whether using the information exchange to share pricing information, as alleged in this Complaint, is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d) whether Plaintiff and the other class members paid artificially inflated fares for U.S. domestic air passenger transportation because of the conduct alleged in this Complaint;

(e) whether Plaintiff and the other class members are entitled to treble damages and other remedies under Section 4 of the Clayton Act, 15 U.S.C. § 15, and, if so, in what amount; and

(f) whether Plaintiff and the other class members are entitled to injunctive relief and other remedies under Section 16 of the Clayton Act, 15 U.S.C. § 26, and, if so, in what form and on what terms.

202. ***Typicality.*** Plaintiff's claims are typical of the claims of the other members of the Classes to which they belong. Fed. R. Civ. P. 23(a)(3). Plaintiff and the other members of the respective Classes suffered comparable injuries because of the same unlawful conduct.

203. ***Adequacy.*** Plaintiff will fairly and adequately protect the interests of the Classes. Fed. R. Civ. P. 23(a)(4). Plaintiff's interests do not conflict with those of the other members of the Classes Planitff seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action and antitrust litigation, and they intend to prosecute this action vigorously.

204. ***Superiority.*** A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Fed. R. Civ. P. 23(b)(3). It will allow many similarly situated persons to pursue common claims in a single forum simultaneously and efficiently, without the duplication of effort and expense that numerous individual actions would require. Each class member's damages are meaningful but small compared with the burden and expense of individual litigation, so it would be impracticable for class members to seek redress individually. Individual actions would also risk inconsistent judgments, incompatible standards of conduct for Defendants, and added delay and expense for the parties and the courts. Plaintiff knows of no unusual difficulty in managing this case as a class action.

## CLAIMS FOR RELIEF

### Count I

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(Agreement to Set Up and Maintain the Information Exchange)**
**(On Behalf of the American Purchaser Class Against ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue)**

205. Plaintiff, on behalf of the American Purchaser Class, incorporates by reference each allegation in this Complaint against ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue.

206. Beginning at a time unknown to Plaintiff, but no later than November 25, 2022, and continuing through the present, ATPCO; 3Victors; Delta and United (acting as owners of ATPCO); Alaska (through its subsidiary, Hawaiian); Southwest; and JetBlue, together with co-conspirators not named as defendants in this Count, including American, entered into a continuing agreement to set up and maintain an information exchange through which horizontal competitors regularly share detailed, timely, competitively sensitive, and nonpublic shopping data, including dynamically generated prices for U.S. domestic air passenger transportation, under a give-to-get policy that requires participants to share data in order to receive comparable data. The purpose of the agreement is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if each airline set its fares without real-time information about its competitors' pricing decisions. The agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

207. Delta and United (acting as owners of ATPCO); Alaska (through its subsidiary, Hawaiian); Southwest; and JetBlue and other co-conspirators that own ATPCO or sit on its board are jointly and severally liable for ATPCO's acts in furtherance of the agreement. ATPCO is and has been jointly controlled by Delta, American, United, and other horizontal competitors that own

its shares and sit together on its board.[355] ATPCO's activities in setting up and maintaining the exchange are concerted action that "joins together separate decisionmakers" pursuing "separate economic interests" as alleged in this Complaint.[356]

208. Co-conspirators not named as defendants in this Count, including American, joined the agreement by agreeing to contribute their own competitively sensitive shopping data to the give-to-get exchange and to pay fees that fund its operation.

209. The agreement alleged in this Count had the following effects, among others:

(a) restraining and suppressing price competition among Delta, United, Alaska, Southwest, and JetBlue and their co-conspirators, including American, in the market for U.S. domestic air passenger transportation;

(b) raising, maintaining, or stabilizing prices for U.S. domestic air passenger transportation at artificially high, noncompetitive levels; and

(c) depriving purchasers of U.S. domestic air passenger transportation from Delta, United, Alaska, Southwest, and JetBlue and their co-conspirators, including American, of the benefits of free and open competition.

210. As a result of the conspiracy, members of the American Purchaser Class, including Plaintiff, have been and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from American than they would have paid absent the conspiracy.

211. Plaintiff and the other members of the American Purchaser Class are entitled to treble damages from ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue, which are jointly and severally liable for the overcharges that class members have paid and will pay directly to members of the conspiracy—including American—as a result of the violation alleged in this Count.

---

[355] *About ATPCO*; *April 2023 Board Release*; *see also 1992 Complaint* ¶¶ 4–12, 20.

[356] *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984).

212. Plaintiff and the other members of the American Purchaser Class are entitled to an injunction against ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue preventing and restraining the violation alleged in this Count.

## Count II

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### (Agreement to Set Up and Maintain the Information Exchange)
### (On Behalf of the JetBlue Purchaser Class Against ATPCO, 3Victors, American, Delta, United, Alaska, and Southwest)

213. Plaintiff, on behalf of the JetBlue Purchaser Class, incorporates by reference each allegation in this Complaint against ATPCO, 3Victors, American, Delta, United, Alaska, and Southwest.

214. Beginning at a time unknown to Plaintiff, but no later than November 25, 2022, and continuing through the present, ATPCO; 3Victors; Delta, American, and United (acting as owners of ATPCO); Alaska (through its subsidiary, Hawaiian); and Southwest, together with co-conspirators not named as defendants in this Count, including JetBlue, entered into a continuing agreement to set up and maintain an information exchange through which horizontal competitors regularly share detailed, timely, competitively sensitive, and nonpublic shopping data, including dynamically generated prices for U.S. domestic air passenger transportation, under a give-to-get policy that requires participants to share data in order to receive comparable data. The purpose of the agreement is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if each airline set its fares without real-time information about its competitors' pricing decisions. The agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

215. Delta, American, and United (acting as owners of ATPCO), and other co-conspirators that own ATPCO or sit on its board are jointly and severally liable for ATPCO's acts

in furtherance of the agreement. ATPCO is and has been jointly controlled by Delta, American, United, and other horizontal competitors that own its shares and sit together on its board.[357] ATPCO's activities in setting up and maintaining the exchange are concerted action, as alleged in this Complaint.[358]

216. Southwest and Alaska, which are named as defendants in this Count, and co-conspirators not named as defendants in this Count, including JetBlue, joined the agreement by agreeing to contribute their own competitively sensitive shopping data to the give-to-get exchange and to pay fees that fund its operation.

217. The agreement alleged in this Count had the following effects, among others:

(a) restraining and suppressing price competition among American, Delta, United, Alaska, and Southwest and their co-conspirators, including JetBlue, in the market for U.S. domestic air passenger transportation;

(b) raising, maintaining, or stabilizing prices for U.S. domestic air passenger transportation at artificially high, noncompetitive levels; and

(c) depriving purchasers of U.S. domestic air passenger transportation from American, Delta, United, Alaska, and Southwest and their co-conspirators, including JetBlue, of the benefits of free and open competition.

218. As a result of the conspiracy, members of the JetBlue Purchaser Class, including Plaintiff, have been and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from JetBlue than they would have paid absent the conspiracy.

219. Plaintiff and the other members of the JetBlue Purchaser Class are entitled to treble damages from ATPCO, 3Victors, American, Delta, United, Alaska, and Southwest, which are jointly and severally liable for the overcharges that class members have paid and will pay directly to a member of the conspiracy—JetBlue—as a result of the violation alleged in this Count.

---

[357] *About ATPCO*; *April 2023 Board Release*; *see also 1992 Complaint* ¶¶ 4–12, 20.

[358] *See Am. Needle*, 560 U.S. at 195; *Copperweld*, 467 U.S. at 769.

220. Plaintiff and the other members of the JetBlue Purchaser Class are entitled to an injunction against ATPCO, 3Victors American, Delta, United, Alaska, and Southwest, preventing and restraining the violation alleged in this Count.

## Count III

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(Agreement to Use the Information Exchange to Share Data)**
**(On Behalf of the American Purchaser Class Against ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue)**

221. Plaintiff, on behalf of the American Purchaser Class, incorporates by reference each allegation in this Complaint against ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue.

222. Beginning at a time unknown to Plaintiff, but no later than November 25, 2022, and continuing through the present, Delta, United, Alaska, Southwest, and JetBlue, together with co-conspirators not named as defendants in this Count, including American, entered into a continuing agreement to use ATPCO's and 3Victors' products, including Iris and PriceEye, to share with one another detailed, timely, competitively sensitive, and nonpublic shopping data, including dynamically generated prices for U.S. domestic air passenger transportation, under a give-to-get policy that requires participants to share data in order to receive comparable data. The purpose of the agreement is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if each airline set its fares without real-time information about its competitors' pricing decisions. The agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

223. Co-conspirators not named as defendants in this Count, including American, joined the agreement to use ATPCO's and 3Victors' products, including Iris and PriceEye, to share data

in a give-to-get exchange by agreeing to contribute their own competitively sensitive shopping data and to pay fees that fund the exchange's operation.

224. The agreement alleged in this Count had the following effects, among others:

(a) restraining and suppressing price competition among Delta, United, Alaska, Southwest, and JetBlue and their co-conspirators, including American, in the market for U.S. domestic air passenger transportation;

(b) raising, maintaining, or stabilizing prices for U.S. domestic air passenger transportation at artificially high, noncompetitive levels; and

(c) depriving purchasers of U.S. domestic air passenger transportation from Delta, United, Alaska, Southwest, and JetBlue and their co-conspirators, including American, of the benefits of free and open competition.

225. As a result of the conspiracy, members of the American Purchaser Class, including Plaintiff, have been and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from American than they would have paid absent the conspiracy.

226. Plaintiff and the other members of the American Purchaser Class are entitled to treble damages from ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue, which are jointly and severally liable for the overcharges that class members have paid and will pay directly to members of the conspiracy—including American—as a result of the violation alleged in this Count.

227. Plaintiff and the other members of the American Purchaser Class are entitled to an injunction against ATPCO, 3Victors, Delta, United, Alaska, Southwest, and JetBlue preventing and restraining the violation alleged in this Count.

## Count IV

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(Agreement to Use the Information Exchange to Share Data)**
**(On Behalf of the JetBlue Purchaser Class Against ATPCO, 3Victors, American, Delta, United, Alaska, and Southwest)**

228. Plaintiff, on behalf of the JetBlue Purchaser Class, incorporates by reference each allegation in this Complaint against ATPCO, 3Victors, American, Delta, United, Alaska, and Southwest.

229. Beginning at a time unknown to Plaintiff, but no later than November 25, 2022, and continuing through the present, American, Delta, United, Alaska, and Southwest, together with co-conspirators including JetBlue, entered into a continuing agreement to use ATPCO's and 3Victors' products, including Iris and PriceEye, to share with one another detailed, timely, competitively sensitive, and nonpublic shopping data, including dynamically generated prices for U.S. domestic air passenger transportation, under a give-to-get policy that requires participants to share data in order to receive comparable data. The purpose of the agreement is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if each airline set its fares without real-time information about its competitors' pricing decisions. The agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

230. Co-conspirators not named as defendants in this Count, including JetBlue, joined the agreement to use ATPCO's and 3Victors' products, including Iris and PriceEye, to share data in a give-to-get exchange by agreeing to contribute their own competitively sensitive shopping data and to pay fees that fund the exchange's operation.

231. The agreement alleged in this Count had the following effects, among others:

(a) restraining and suppressing price competition among American, Delta, United, Alaska, and Southwest and their co-conspirators, including JetBlue, in the market for U.S. domestic air passenger transportation;

(b) raising, maintaining, or stabilizing prices for U.S. domestic air passenger transportation at artificially high, noncompetitive levels; and

(c) depriving purchasers of U.S. domestic air passenger transportation from American, Delta, United, Alaska, and Southwest and their co-conspirators, including JetBlue, of the benefits of free and open competition.

232. As a result of the conspiracy, members of the JetBlue Purchaser Class, including Plaintiff, have been and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from JetBlue than they would have paid absent the conspiracy.

233. Plaintiff and the other members of the JetBlue Purchaser Class are entitled to treble damages from ATPCO, 3Victors, American, Delta, United, Alaska, and Southwest, which are jointly and severally liable for the overcharges that class members have paid and will pay directly to a member of the conspiracy—JetBlue—as a result of the violation alleged in this Count.

234. Plaintiff and the other members of the JetBlue Purchaser Class are entitled to an injunction against ATPCO, 3Victors, American, Delta, United, Alaska, and Southwest preventing and restraining the violation alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Classes, respectfully requests the following relief:

A. The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3); appoint Plaintiff as class representatives and Plaintiff's counsel of record as class counsel; and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes once certified;

B. The unlawful conduct, conspiracy, or combination alleged in this Complaint be adjudged and decreed a violation of Section 1 of the Sherman Act;

C. Plaintiff and the Classes recover damages to the maximum extent allowed under by law, and that joint and several judgments in favor of Plaintiff and the Classes be entered against Defendants in an amount to be trebled to the extent the law permits;

D. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E. Plaintiff and the Classes be awarded pre- and post-judgment interest, at the highest legal rate, from and after the date of service of this Complaint to the extent allowed by law;

F. Plaintiff and the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

G. Plaintiff and the Classes be granted such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury under Rule 38(b) on all issues so triable.

Dated: November 24, 2026.

Respectfully submitted,

*/s/ Jeffrey R. Bragalone*
Jeffrey R. Bragalone, Texas Bar No. 02855775
Terry A. Saad, Texas Bar No. 24066015
**BRAGALONE OLEJKO SAAD P.C.**
901 Main Street
Suite 3800
Dallas, Texas 75202
Tel.: (214) 785-6670
jbragalone@bosfirm.com
tsaad@bosfirm.com

Rex A. Sharp, Texas Bar No. 18118800
Ryan C. Hudson, Texas Bar No. 24053274
Isaac L. Diel*
W. Greg Wright*
Hammons P. Hepner,* Texas Bar No. 24134312
**SHARP LAW LLP**
4820 W. 75th Street
Prairie Village, Kansas 66208
Tel.: (913) 901-0500
Fax: (913) 261-7564
rsharp@midwest-law.com
rhudson@midwest-law.com
idiel@midwest-law.com
gwright@midwest-law.com
hhepner@midwest-law.com

*Pro hac vice application forthcoming

*Attorneys for Plaintiff and the Proposed Classes*